E. I. DU PONT DE NEMOURS & CO. ET AL. *v.* TRAIN, ADMINISTRATOR, ENVIRONMENTAL PRO-TECTION AGENCY, ET AL.

No. 75–978.   Argued December 8, 1976—Decided February 23, 1977*

———

. *Together with No. 75–1473, *E. I. du Pont de Nemours & Co. et al.* v. *Train, Administrator, Environmental Protection Agency,* and No. 75–1705, *Train, Administrator, Environmental Protection Agency* v. *E. I. du Pont de Nemours & Co. et al.,* also on certiorari to the same court.

S<small>TEVENS</small>, J., delivered the opinion of the Court, in which all Members joined, except P<small>OWELL</small>, J., who took no part in the consideration or decision of the cases.

*Robert C. Barnard* argued the cause for petitioners in Nos. 75–978 and 75–1473 and for respondents in No. 75–1705. With him on the briefs was *Charles F. Lettow.*

*Deputy Solicitor General Friedman* argued the cause for respondents in Nos. 75–978 and 75–1473 and for petitioner in No. 75–1705. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Taft, Howard E. Shapiro, Edmund B. Clark, Kathryn A. Oberly,* and *Alan W. Eckert.*†

M<small>R</small>. J<small>USTICE</small> S<small>TEVENS</small> delivered the opinion of the Court.

Inorganic chemical manufacturing plants operated by the eight petitioners in Nos. 75–978 and 75–1473 discharge various

---

†*Frederick M. Rowe, Edward W. Warren,* and *Stark Ritchie* filed a brief for the American Petroleum Institute as *amicus curiae* in Nos. 75–1473 and 75–1705 urging reversal.

*George C. Freeman, Jr.,* and *Henry V. Nickel* filed a brief for the Appalachian Power Co. et al. as *amici curiae* in Nos. 75–1473 and 75–1705 urging affirmance.

Briefs of *amici curiae* in No. 75–978 were filed by *Thomas H. Truitt* for the American Paper Institute, and by *Edward L. Strohbehn, Jr.,* for the Natural Resources Defense Council, Inc.

pollutants into the Nation's waters and therefore are "point sources" within the meaning of the Federal Water Pollution Control Act (Act), as added and amended by § 2 of the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, 33 U. S. C. § 1251 *et seq.* (1970 ed., Supp. V).[1] The Environmental Protection Agency[2] has promulgated industrywide regulations imposing three sets of precise limitations on petitioners' discharges. The first two impose progressively higher levels of pollution control on existing point sources after July 1, 1977, and after July 1, 1983, respectively. The third set imposes limits on "new sources" that may be constructed in the future.[3]

These cases present three important questions of statutory construction: (1) whether EPA has the authority under § 301 of the Act to issue industrywide regulations limiting discharges by existing plants; (2) whether the Court of Appeals, which admittedly is authorized to review the standards for new sources, also has jurisdiction under § 509 to review the regulations concerning existing plants; and (3) whether the new-source standards issued under § 306 must allow variances for individual plants.

---

[1] A "point source" is "any discernible, confined and discrete conveyance, . . . from which pollutants are or may be discharged." § 502 (14), 33 U. S. C. § 1362 (14) (1970 ed., Supp. V).

[2] Throughout this opinion we will refer interchangeably to the Administrator of the EPA and to the Agency itself.

[3] The reasons for the statutory scheme have been described as follows: "Such direct restrictions on discharges facilitate enforcement by making it unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated. In addition, a discharger's performance is now measured against strict technology-based effluent limitations—specified levels of treatment—to which it must conform, rather than against limitations derived from water quality standards to which it and other polluters must collectively conform." *EPA* v. *California ex rel. State Water Resources Control Board,* 426 U. S. 200, 204–205 (footnotes omitted).

As a preface to our discussion of these three questions, we summarize relevant portions of the statute and then describe the procedure which EPA followed in promulgating the challenged regulations.

## The Statute

The statute, enacted on October 18, 1972, authorized a series of steps to be taken to achieve the goal of eliminating all discharges of pollutants into the Nation's waters by 1985, § 101 (a)(1).

The first steps required by the Act are described in § 304, which directs the Administrator to develop and publish various kinds of technical data to provide guidance in carrying out responsibilities imposed by other sections of the Act. Thus, within 60 days, 120 days, and 180 days after the date of enactment, the Administrator was to promulgate a series of guidelines to assist the States in developing and carrying out permit programs pursuant to § 402. §§ 304 (h), (f), (g). Within 270 days, he was to develop the information to be used in formulating standards for new plants pursuant to § 306. § 304 (c). And within one year he was to publish regulations providing guidance for effluent limitations on existing point sources. Section 304 (b)[4] goes into great detail concerning

---

[4] Section 304 (b) provides:

"(b) For the purpose of adopting or revising effluent limitations under this Act the Administrator shall, after consultation with appropriate Federal and State agencies and other interested persons, publish within one year of enactment of this title, regulations, providing guidelines for effluent limitations, and, at least annually thereafter, revise, if appropriate, such regulations. Such regulations shall—

"(1)(A) identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources (other than publicly owned treatment works); and

"(B) specify factors to be taken into account in determining the control measures and practices to be applicable to point sources (other than

the contents of these regulations. They must identify the degree of effluent reduction attainable through use of the best practicable or best available technology for a class of plants. The guidelines must also "specify factors to be taken into account" in determining the control measures applicable to point sources within these classes. A list of factors to be considered then follows. The Administrator

publicly owned treatment works) within such categories or classes. Factors relating to the assessment of best practicable control technology currently available to comply with subsection (b)(1) of section 301 of this Act shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate;

"(2)(A) identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best control measures and practices achievable including treatment techniques, process and procedure innovations, operating methods, and other alternatives for classes and categories of point sources (other than publicly owned treatment works); and

"(B) specify factors to be taken into account in determining the best measures and practices available to comply with subsection (b)(2) of section 301 of this Act to be applicable to any point source (other than publicly owned treatment works) within such categories or classes. Factors relating to the assessment of best available technology shall take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate; and

"(3) identify control measures and practices available to eliminate the discharge of pollutants from categories and classes of point sources, taking into account the cost of achieving such elimination of the discharge of pollutants." 86 Stat. 851, 33 U. S. C. § 1314 (b) (1970 ed., Supp. V).

was also directed to develop and publish, within one year, elaborate criteria for water quality accurately reflecting the most current scientific knowledge, and also technical information on factors necessary to restore and maintain water quality. § 304 (a). The title of § 304 describes it as the "information and guidelines" portion of the statute.

Section 301 is captioned "effluent limitations." [5] Section

---

[5] Section 301 provides in pertinent part:

"SEC. 301. (a) Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful.

"(b) In order to carry out the objective of this Act there shall be achieved—

"(1)(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 304 (b) of this Act . . . .

.        .        .        .

"(2)(A) not later than July 1, 1983, effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which (i) shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator pursuant to section 304 (b)(2) of this Act, which such effluent limitations shall require the elimination of discharges of all pollutants if the Administrator finds, on the basis of information available to him (including information developed pursuant to section 315), that such elimination is technologically and economically achievable for a category or class of point sources as determined in accordance with regulations issued by the Administrator pursuant to section 304 (b)(2) of this Act . . . .

.        .        .        .

"(c) The Administrator may modify the requirements of subsection (b)(2)(A) of this section with respect to any point source for which a permit application is filed after July 1, 1977, upon a showing by the owner or operator of such point source satisfactory to the Administrator that such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or

301 (a) makes the discharge of any pollutant unlawful unless the discharge is in compliance with certain enumerated sections of the Act. The enumerated sections which are relevant to this case are § 301 itself, § 306, and § 402.[6] A brief word about each of these sections is necessary.

Section 402[7] authorizes the Administrator to issue permits for individual point sources, and also authorizes him to review and approve the plan of any State desiring to administer its own permit program. These permits serve "to transform generally applicable effluent limitations . . . into the obligations (including a timetable for compliance) of the individual discharger[s] . . . ." *EPA* v. *California ex rel. State*

---

operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants.

"(d) Any effluent limitation required by paragraph (2) of subsection (b) of this section shall be reviewed at least every five years and, if appropriate, revised pursuant to the procedure established under such paragraph.

"(e) Effluent limitations established pursuant to this section or section 302 of this Act shall be applied to all point sources of discharge of pollutants in accordance with the provisions of this Act." 86 Stat. 844, 33 U. S. C. § 1311 (1970 ed., Supp. V).

[6] There is no provision for compliance with § 304, the guideline section.

[7] Section 402 (a)(1) provides:

"Except as provided in sections 318 and 404 of this Act, the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 301 (a), upon condition that such discharge will meet either all applicable requirements under sections 301, 302, 306, 307, 308, and 403 of this Act, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this Act." 86 Stat. 880, 33 U. S. C. § 1342 (a)(1) (1970 ed., Supp. V).

Under § 402 (b), the Administrator may delegate this authority to the States, but retains the power to withdraw approval of the state program, § 402 (c)(3), and to veto individual state permits, § 402 (d). Finally, under § 402 (k), compliance with the permit is generally deemed compliance with § 301. Twenty-seven States now administer their own permit programs.

*Water Resources Control Board,* 426 U. S. 200, 205. Petitioner chemical companies' position in this litigation is that § 402 provides the only statutory authority for the issuance of enforceable limitations on the discharge of pollutants by existing plants. It is noteworthy, however, that although this section authorizes the imposition of limitations in individual permits, the section itself does not mandate either the Administrator or the States to use permits as the method of prescribing effluent limitations.

Section 306 [8] directs the Administrator to publish within 90 days a list of categories of sources discharging pollutants and,

---

[8] The pertinent provisions of § 306, 86 Stat. 854, 33 U. S. C. § 1316 (1970 ed., Supp. V), are as follows:

"(a) For purposes of this section:

"(1) The term 'standard of performance' means a standard for the control of the discharge of pollutants which reflects the greatest degree of effluent reduction which the Administrator determines to be achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants.

.     .     .     .

"(b)(1) . . .

"(B) As soon as practicable, but in no case more than one year, after a category of sources is included in a list under subparagraph (A) of this paragraph, the Administrator shall propose and publish regulations establishing Federal standards of performance for *new sources* within such category. . . .

"(2) The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards and shall consider the type of process employed (including whether batch or continuous).

"(3) The provisions of this section shall apply to any new source owned or operated by the United States.

.     .     .     .

"(e) After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source."

within one year thereafter, to publish regulations establishing national standards of performance for new sources within each category. Section 306 contains no provision for exceptions from the standards for individual plants; on the contrary, subsection (e) expressly makes it unlawful to operate a new source in violation of the applicable standard of performance after its effective date. The statute provides that the new-source standards shall reflect the greatest degree of effluent reduction achievable through application of the best available demonstrated control technology.

Section 301 (b) defines the effluent limitations that shall be achieved by existing point sources in two stages. By July 1, 1977, the effluent limitations shall require the application of the best *practicable* control technology currently available; by July 1, 1983, the limitations shall require application of the best *available* technology economically achievable. The statute expressly provides that the limitations which are to become effective in 1983 are applicable to "categories and classes of point sources"; this phrase is omitted from the description of the 1977 limitations. While § 301 states that these limitations "shall be achieved," it fails to state who will establish the limitations.

Section 301 (c) authorizes the Administrator to grant variances from the 1983 limitations. Section 301 (e) states that effluent limitations established pursuant to § 301 shall be applied to all point sources.

To summarize, § 301 (b) requires the achievement of effluent limitations requiring use of the "best practicable" or "best available" technology. It refers to § 304 for a definition of these terms. Section 304 requires the publication of "regulations, providing guidelines for effluent limitations." Finally, permits issued under § 402 must require compliance with § 301 effluent limitations. Nowhere are we told who sets the § 301 effluent limitations, or precisely how they relate to § 304 guidelines and § 402 permits.

## The Regulations

The various deadlines imposed on the Administrator were too ambitious for him to meet. For that reason, the procedure which he followed in adopting the regulations applicable to the inorganic chemical industry and to other classes of point sources is somewhat different from that apparently contemplated by the statute. Specifically, as will appear, he did not adopt guidelines pursuant to § 304 before defining the effluent limitations for existing sources described in § 301 (b) or the national standards for new sources described in § 306. This case illustrates the approach the Administrator followed in implementing the Act.

EPA began by engaging a private contractor to prepare a Development Document. This document provided a detailed technical study of pollution control in the industry. The study first divided the industry into categories. For each category, present levels of pollution were measured and plants with exemplary pollution control were investigated. Based on this information, other technical data, and economic studies, a determination was made of the degree of pollution control which could be achieved by the various levels of technology mandated by the statute. The study was made available to the public and circulated to interested persons. It formed the basis of "effluent limitation guideline" regulations issued by EPA after receiving public comment on proposed regulations. These regulations divide the industry into 22 subcategories. Within each subcategory, precise numerical limits are set for various pollutants.[9] The regulations for

---

[9] Some subcategories are required to eliminate all discharges by 1977. E. g., 40 CFR §§ 415.70–415.76 (1976). Other subcategories are subject to less stringent restrictions. For instance, by 1977 plants producing titanium dioxide by the chloride process must reduce average daily discharges of dissolved iron to 0.72 pounds per thousand pounds of product. This limit is cut in half for existing plants in 1983 and for all new plants. 40 CFR §§ 415.220–415.225 (1976).

each subcategory contain a variance clause, applicable only to the 1977 limitations.[10]

Eight chemical companies filed petitions in the United States Court of Appeals for the Fourth Circuit for review of these regulations.[11] The Court of Appeals rejected their challenge to EPA's authority to issue precise, single-number limitations for discharges of pollutants from existing sources. It held, however, that these limitations and the new plant standards were only "presumptively applicable" to individual plants.[12] We granted the chemical companies' petitions for certiorari in order to consider the scope of EPA's authority to issue existing-source regulations. 425 U. S. 933; 426 U. S. 947. We also granted the Government's cross-petition for review of the ruling that new-source standards are only pre-

---

[10] These limitations may be made "either more or less stringent" to the extent that "factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered" in establishing the limitations. See, e. g., for the two subcategories discussed in n. 9, supra, 40 CFR §§ 415.72 and 415.222 (1976), respectively.

[11] Because EPA's authority to issue the regulations is closely tied to the question whether the regulations are directly reviewable in the Court of Appeals, see infra, at 124–125, some of the companies also filed suit in District Court challenging the regulations. The District Court held that EPA had the authority to issue the regulations and that exclusive jurisdiction was therefore in the Court of Appeals. 383 F. Supp. 1244 (WD Va. 1974), aff'd, 528 F. 2d 1136 (CA4 1975) (Du Pont I).

[12] The Court of Appeals issued two separate opinions. In Du Pont I, supra, the court held that it had exclusive jurisdiction to consider the validity of the regulations. It therefore affirmed the District Court's dismissal of a suit to set aside the regulations. See n. 11, supra. In Du Pont II, 541 F. 2d 1018 (1976), the court held that EPA was authorized to issue "presumptively applicable" effluent limitations and new-source standards. No. 75–978 is the companies' petition for certiorari in Du Pont I, which we granted last Term, 425 U. S. 933. No. 75–1473 is their petition in Du Pont II. We granted that petition, consolidated it with EPA's cross-petition, No. 75–1705, and ordered that they be argued in tandem with the companies' petition in Du Pont I. 426 U. S. 947.

sumptively applicable. *Ibid.* For convenience, we will refer to the chemical companies as the "petitioners."

*The Issues*

The broad outlines of the parties' respective theories may be stated briefly. EPA contends that § 301 (b) authorizes it to issue regulations establishing effluent limitations for classes of plants. The permits granted under § 402, in EPA's view, simply incorporate these across-the-board limitations, except for the limited variances allowed by the regulations themselves and by § 301 (c). The § 304 (b) guidelines, according to EPA, were intended to guide it in later establishing § 301 effluent-limitation regulations. Because the process proved more time consuming than Congress assumed when it established this two-stage process, EPA condensed the two stages into a single regulation.[13]

In contrast, petitioners contend that § 301 is not an independent source of authority for setting effluent limitations by regulation. Instead, § 301 is seen as merely a description of the effluent limitations which are set for each plant on an individual basis during the permit-issuance process. Under the industry view, the § 304 guidelines serve the function of guiding the permit issuer in setting the effluent limitations.

The jurisdictional issue is subsidiary to the critical question whether EPA has the power to issue effluent limitations by regulation. Section 509 (b)(1), 86 Stat. 892, 33 U. S. C. 1369 (b)(1), provides that "[r]eview of the Administrator's action . . . (E) in approving or promulgating any effluent limitation . . . under section 301" may be had in the courts of appeals. On the other hand, the Act does not provide for judicial review of § 304 guidelines. If

---

[13] Section 304 (b) calls for publication of guideline regulations within one year of the Act's passage. EPA failed to meet this deadline and was ordered to issue the regulations on a judicially imposed timetable. *Natural Resources Defense Council, Inc.* v. *Train,* 166 U. S. App. D. C. 312, 510 F. 2d 692 (1975).

EPA is correct that its regulations are "effluent limitation[s] under section 301," the regulations are directly reviewable in the Court of Appeals. If industry is correct that the regulations can only be considered § 304 guidelines, suit to review the regulations could probably be brought only in the District Court, if anywhere.[14] Thus, the issue of jurisdiction to review the regulations is intertwined with the issue of EPA's power to issue the regulations.[15]

_____

[14] Although the Act itself does not provide for review of guidelines, the Eighth Circuit has held that they are reviewable in the district court, apparently under the Administrative Procedure Act. *CPC Int'l, Inc.* v. *Train,* 515 F. 2d 1032, 1038 (1975) (*CPC I*). It has been suggested, however, that even if the EPA regulations are considered to be only § 304 guidelines, the Court of Appeals might still have ancillary jurisdiction to review them because of their close relationship with the § 301 effluent limitations, and because they were developed on the same record as the § 306 standards of performance for new plants, which are directly reviewable in the Court of Appeals.

[15] The Courts of Appeals have resolved these issues in various ways. Only the Eighth Circuit, the first to consider the issues, has accepted the industry position. In *CPC I, supra,* it held that EPA lacked the authority to issue effluent-limitation regulations and that jurisdiction to review the regulations as § 304 guidelines was in the District Court. The Fourth Circuit, in *Du Pont II, supra,* and the Tenth Circuit, in *American Petroleum Institute* v. *EPA,* 540 F. 2d 1023 (1976), held that EPA has the authority to issue effluent-limitation regulations, but that these regulations are only presumptively applicable to individual sources. The majority position, adopted by the Third Circuit, *American Iron & Steel Institute* v. *EPA,* 526 F. 2d 1027 (1975); the Seventh Circuit, *American Meat Institute* v. *EPA,* 526 F. 2d 442 (1975); the District of Columbia Circuit, *American Frozen Food Institute* v. *Train,* 176 U. S. App. D. C. 105, 539 F. 2d 107 (1976); and the Second Circuit, *Hooker Chemicals & Plastics Corp.* v. *Train,* 537 F. 2d 620 (1976), is that EPA has the authority to issue regulations setting forth effluent limitations which individual plants may not exceed. Even these courts are not in complete agreement about the form the regulations should take. The commentators have also divided on these problems. See Parenteau & Tauman, The Effluent Limitations Controversy, 6 Ecology L. Q. 1 (1976); Note, Judicial Maelstrom in Federal Waters, 45 Ford. L. Rev. 625 (1976); Comment,

## I

We think § 301 itself is the key to the problem. The statutory language concerning the 1983 limitations, in particular, leaves no doubt that these limitations are to be set by regulation. Subsection (b)(2)(A) of § 301 states that by 1983 "effluent limitations *for categories and classes* of point sources" are to be achieved which will require "application of the best available technology economically achievable *for such category or class.*" (Emphasis added.) These effluent limitations are to require elimination of all discharges if "such elimination is technologically and economically achievable for a *category or class* of point sources." (Emphasis added.) This is "language difficult to reconcile with the view that in-

---

The Application of Effluent Limitations and Effluent Guidelines to Industrial Polluters, 13 Houst. L. Rev. 348 (1976); Note, Effective National Regulation of Point Sources Under the 1972 Federal Water Pollution Control Act, 10 Ga. L. Rev. 983 (1976).

The difference in opinion among the Circuits may be less significant than might appear. The Eighth Circuit has concluded:

"Under our ruling, the limitations written into individual permits for existing point sources should be substantially similar to those written into permits if the EPA's theory of the Act were to be adopted.

"The only practical difference resulting from this Court's interpretation of the statute is that the § 304 (b) guidelines for *existing* sources must be reviewed first in the District Court, while the § 306 (b) standards of performance for *new* plants—often based on the same scientific research and conclusions—must be reviewed first in the Court of Appeals." *CPC Int'l, Inc.* v. *Train,* 540 F. 2d 1329, 1331–1332, n. 1 (1976) (*CPC II*). See also *American Meat Institute, supra,* at 449 n. 14.

While this Court has not had occasion to rule directly on this question, our discussion of the Act in a case decided last Term is suggestive of the answer. We then described § 402 permits as "serv[ing] to transform *generally applicable effluent limitations* . . . into the obligations (including a timetable for compliance) of the individual discharger . . . ." *EPA* v. *California ex rel. State Water Resources Control Board,* 426 U. S., at 205 (emphasis added). This description clearly implied that effluent limitations of general application are to be established before individual permits are issued.

dividual effluent limitations are to be set when each permit is issued." *American Meat Institute* v. *EPA,* 526 F. 2d 442, 450 (CA7 1975). The statute thus focuses expressly on the characteristics of the "category or class" rather than the characteristics of individual point sources.[16] Normally, such classwide determinations would be made by regulation, not in the course of issuing a permit to one member of the class.[17]

Thus, we find that § 301 unambiguously provides for the use of regulations to establish the 1983 effluent limitations. Different language is used in § 301 with respect to the 1977 limitations. Here, the statute speaks of "effluent limitations for point sources," rather than "effluent limitations for categories and classes of point sources." Nothing elsewhere in the Act, however, suggests any radical difference in the mechanism used to impose limitations for the 1977 and 1983 deadlines. See *American Iron & Steel Institute* v. *EPA,* 526 F. 2d 1027, 1042 n. 32 (CA3 1975). For instance, there is no indication in either § 301 or § 304 that the § 304 guidelines play a different role in setting 1977 limitations. Moreover, it would be highly anomalous if the 1983 regulations and the new-source standards[18] were directly reviewable in the Court of

---

[16] The Court of Appeals noted that "[t]he 1983 and new source requirements are on the basis of categories." *Du Pont II,* 541 F. 2d, at 1029.

[17] Furthermore, § 301 (c) provides that the 1983 limitations may be modified if the owner of a plant shows that "such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants." This provision shows that the § 301 (b) limitations for 1983 are to be established prior to consideration of the characteristics of the individual plant. *American Iron & Steel Institute* v. *EPA, supra,* at 1037 n. 15. Moreover, it shows that the term "best technology economically achievable" does not refer to any individual plant. Otherwise, it would be impossible for this "economically achievable" technology to be beyond the individual owner's "economic capability."

[18] Section 509 (b) (1) (A) makes new-source standards directly reviewable in the court of appeals. The Court of Appeals in this litigation did not believe that Congress "intended for review to be bifurcated," with the

Appeals, while the 1977 regulations based on the same administrative record were reviewable only in the District Court. The magnitude and highly technical character of the administrative record involved with these regulations makes it almost inconceivable that Congress would have required duplicate review in the first instance by different courts. We conclude that the statute authorizes the 1977 limitations as well as the 1983 limitations to be set by regulation, so long as some allowance is made for variations in individual plants, as EPA has done by including a variance clause in its 1977 limitations.[19]

The question of the form of § 301 limitations is tied to the question whether the Act requires the Administrator or the permit issuer to establish the limitations. Section 301 does not itself answer this question, for it speaks only in the passive voice of the achievement and establishment of the limitations. But other parts of the statute leave little doubt on this score. Section 304 (b) states that "[f]or the purpose of adopting or revising effluent limitations . . . the Administrator shall" issue guideline regulations; while the judicial-review section, § 509 (b)(1), speaks of "the Administrator's action . . . in approving or promulgating any effluent limitation or other limitation under section 301 . . . ." See *infra,* at 136–137. And § 101 (d) requires us to resolve any ambiguity on this score in favor of the Administrator. It provides that "[e]xcept as otherwise *expressly* provided in this Act, the

new-source standards reviewable in a different forum than regulations governing existing sources. 528 F. 2d, at 1141. The Eighth Circuit has acknowledged the practical problems and potential for inconsistent rulings created by bifurcated review. *CPC II, supra,* at 1332 n. 1. We consider it unlikely that Congress intended such bifurcated review, and even less likely that Congress intended regulations governing existing sources to be reviewable in two different forums, depending on whether the regulations require compliance in 1977 or 1983.

[19] We agree with the Court of Appeals, 541 F. 2d, at 1028, that consideration of whether EPA's variance provision has the proper scope would be premature.

Administrator of the Environmental Protection Agency . . . shall administer this Act." (Emphasis added.) In sum, the language of the statute supports the view that § 301 limitations are to be adopted by the Administrator, that they are to be based primarily on classes and categories, and that they are to take the form of regulations.

The legislative history supports this reading of § 301. The Senate Report states that "pursuant to subsection 301 (b)(1) (A), and Section 304 (b)" the Administrator is to set a base level for all plants in a given category, and "[i]n no case . . . should any plant be allowed to discharge more pollutants per unit of production than is defined by that base level." S. Rep. No. 92–414, p. 50 (1971), Leg. Hist. 1468.[20] The Conference Report on § 301 states that "the determination of the economic impact of an effluent limitation [will be made] on the basis of classes and categories of point sources, as distinguished from a plant by plant determination." Sen. Conf. Rep. No. 92–1236, p. 121 (1972), Leg. Hist. 304. In presenting the Conference Report to the Senate, Senator Muskie, perhaps the Act's primary author, emphasized the importance of uniformity in setting § 301 limitations. He explained that this goal of uniformity required that EPA focus on classes or categories of sources in formulating effluent limitations. Regarding the requirement contained in § 301 that plants use the "best practicable control technology" by 1977, he stated:

"The modification of subsection 304 (b)(1) is intended to clarify what is meant by the term 'practicable.' The balancing test between total cost and effluent reduction

---

[20] All citations to the legislative history are to Senate Committee on Public Works, A Legislative History of the Water Pollution Control Act Amendments of 1972, prepared by the Environmental Policy Division of the Congressional Research Service of the Library of Congress (Comm. Print 1973).

benefits is intended to limit the application of technology only where the additional degree of effluent reduction is wholly out of proportion to the costs of achieving such marginal level of reduction for *any class or category* of sources.

"The Conferees agreed upon this limited cost-benefit analysis in order to maintain *uniformity within a class and category* of point sources subject to effluent limitations, and to avoid imposing on the Administrator any requirement to consider the location of sources within a category or to ascertain water quality impact of effluent controls, or to determine the economic impact of controls on any individual plant in a single community." 118 Cong. Rec. 33696 (1972), Leg. Hist. 170 (emphasis added).

He added that:

"The Conferees intend that the factors described in section 304 (b) be considered only within classes or categories of point sources and that such factors not be considered at the time of the application of an effluent limitation to an individual point source within such a category or class." 118 Cong. Rec. 33697 (1972), Leg. Hist. 172.

This legislative history supports our reading of § 301 and makes it clear that the § 304 guidelines are not merely aimed at guiding the discretion of permit issuers in setting limitations for individual plants.

What, then, is the function of the § 304 (b) guidelines? As we noted earlier, § 304 (b) requires EPA to identify the amount of effluent reduction attainable through use of the best practicable or available technology and to "specify factors to be taken into account" in determining the pollution control methods "to be applicable to point sources . . . within such categories or classes." These guidelines are to be issued "[f]or the purpose of adopting or revising effluent limitations

under this Act." [21] As we read it, § 304 requires that the guidelines survey the practicable or available pollution-control technology for an industry and assess its effectiveness. The guidelines are then to describe the methodology EPA intends to use in the § 301 regulations to determine the effluent limitations for particular plants. If the technical complexity of the task had not prevented EPA from issuing the guidelines within the statutory deadline,[22] they could have provided valuable

---

[21] Petitioners rely heavily on selected portions of the following passage from the Senate Report to support their view of § 301:

"It is the Committee's intention that pursuant to subsection 301 (b) (1) (A), and Section 304 (b) the Administrator will interpret the term 'best practicable' when applied to various categories of industries as a basis for specifying clear and precise effluent limitations to be implemented by January 1, 1976 [now July 1, 1977]. In defining best practicable for any given industrial category, the Committee expects the Administrator to take a number of factors into account. These factors should include the age of the plants, their size and the unit processes involved and the cost of applying such controls. In effect, for any industrial category, the Committee expects the Administrator to define a range of discharge levels, above a certain base level applicable to all plants within that category. In applying effluent limitations to any individual plant, the factors cited above should be applied to that specific plant. In no case, however, should any plant be allowed to discharge more pollutants per unit of production than is defined by that base level.

"The Administrator should establish the range of best practicable levels based upon the average of the best existing performance by plants of various sizes, ages, and unit processes within each industrial category." S. Rep. No. 92–414, p. 50 (1971), Leg. Hist. 1468.

If construed to be consistent with the legislative history we have already discussed, and with what we have found to be the clear statutory language, this language can be fairly read to allow the use of subcategories based on factors such as size, age, and unit processes, with effluent limitations for each subcategory normally based on the performance of the best plants in that subcategory.

[22] As the Court of Appeals held, 541 F. 2d, at 1027, EPA's response to this problem was within its discretion. Accord, *American Frozen Food Institute* v. *Train*, 176 U. S. App. D. C., at 128–129, 539 F. 2d, at 130–131. Even if we ·considered this course to constitute a procedural error,

guidance to permit issuers, industry, and the public, prior to the issuance of the § 301 regulations.[23]

Our construction of the Act is supported by § 501 (a), which gives EPA the power to make "such regulations as are necessary to carry out" its functions, and by § 101 (d), which charges the agency with the duty of administering the Act. In construing this grant of authority, as Mr. Justice Harlan wrote in connection with a somewhat similar problem:

> " '[C]onsiderations of feasibility and practicality are certainly germane' to the issues before us. *Bowles* v. *Willingham*, [321 U. S. 503,] 517. We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted." *Permian Basin Area Rate Cases*, 390 U. S. 747, 777.

The petitioners' view of the Act would place an impossible burden on EPA. It would require EPA to give individual consideration to the circumstances of each of the more than 42,000 dischargers who have applied for permits, Brief for Re-

---

it would not invalidate the § 301 regulations themselves since the purposes for issuing the guidelines were substantially achieved, see n. 23, *infra,* and no prejudice has been shown.

[23] The guidelines could have served at least three functions. First, they would have provided guidance to permit issuers prior to promulgation of the § 301 effluent limitation regulations. Second, they would have given industry more time to prepare to meet the § 301 regulations. Third, they would have afforded a greater opportunity for public input into the final § 301 regulations, by giving notice of the general outlines of those regulations. These functions were substantially served by EPA's practice of obtaining public comment on the development document and proposed regulations. In addition, the guidelines could furnish technical guidance to companies lacking expertise in pollution control by informing them of appropriate control methods. See S. Rep. No. 92–414, p. 45 (1971), Leg. Hist. 1463. This function is served by the Development Document and supporting materials.

spondents in No. 75–978, p. 30 n. 22, and to issue or approve all these permits well in advance of the 1977 deadline in order to give industry time, to install the necessary pollution-control equipment. We do not believe that Congress would have failed so conspicuously to provide EPA with the authority needed to achieve the statutory goals.

Both EPA and petitioners refer to numerous other provisions of the Act and fragments of legislative history in support of their positions. We do not find these conclusive, and little point would be served by discussing them in detail. We are satisfied that our reading of § 301 is consistent with the rest of the legislative scheme.[24]

---

[24] See *American Iron & Steel Institute* v. *EPA,* 526 F. 2d, at 1037–1041; *American Meat Institute* v. *EPA,* 526 F. 2d, at 450–452; *American Frozen Food Institute* v. *Train,* 176 U. S. App. D. C., at 114–129, 539 F. 2d, at 116–131. As these courts have noted, a number of provisions of the Act seem to assume that § 301 effluent limitations have some existence apart from § 402 permits. Section 301 (a) makes any discharge unlawful "[e]xcept as in compliance with this section and sectio[n] . . . 402 . . . of this Act." Similarly, § 509 (b), the judicial-review provision, refers separately to the Administrator's action "(E) in approving or promulgating any effluent limitation or other limitation under section 301 . . . and (F) in issuing or denying any permit under section 402." Likewise, § 505 (f) defines "effluent standard or limitation" for purposes of the citizen-enforcement provision of the Act, to include "(2) an effluent limitation or other limitation under section 301 or 302 of this Act," and "(6) a permit or condition thereof issued under section 402 of this Act." The legislative history also recognizes a distinction between permit conditions and § 301 limitations. For instance: "The [House] Committee further recognizes that the requirements under sectio[n] 301 . . . will not all be promulgated immediately upon enactment of this bill. Nevertheless, it would be unreasonable to delay issuing of permits until all the implementing steps are necessary." H. R. Rep. No. 92–911, p. 126 (1972), Leg. Hist. 813.

These Court of Appeals decisions have also thoroughly considered the arguments the Eighth Circuit found to be persuasive. The most important contrary arguments are these:

(1) The Eighth Circuit was impressed by the differences between § 301 and sections explicitly authorizing EPA to issue regulations. These dif-

Language we recently employed in another case involving the validity of EPA regulations applies equally to this case:

"We therefore conclude that the Agency's interpretation . . . was 'correct,' to the extent that it can be said with complete assurance that any particular interpretation of a complex statute such as this is the 'correct' one. Given this conclusion, as well as the facts that the Agency is charged with administration of the Act, and that there has undoubtedly been reliance upon its interpretation

---

ferences are less than the Eighth Circuit believed. For instance, the Eighth Circuit stressed that the explicitly authorized regulations were referred to as "standards," and that this term is not used in § 301. *CPC I,* 515 F. 2d, at 1038. But § 316 (b) refers to "[a]ny standard established pursuant to section 301." Other differences between § 301 and sections providing explicitly for enforceable regulations, such as the lack of any statutory timetable for § 301 limitations, can be explained on the basis of the greater difficulty of drafting § 301 regulations.

(2) There was heated debate in Congress concerning whether EPA should be able to veto individual state permits, as the Act now provides. The Eighth Circuit believed that "creation of the veto power would make no sense if the EPA was already empowered to promulgate regulations under § 301." *CPC I, supra,* at 1040–1041. We disagree. "[A] veto power could have been considered just as necessary to ensure compliance by the permit grantors with section 301 limitations as with section 304 guidelines." *American Iron & Steel Institute, supra,* at 1041. The veto power would be especially important because large numbers of permits could be issued before the § 301 regulations were promulgated. During this interim period, inconsistency with the § 304 (b) guidelines could be a ground for vetoing a permit. (Moreover, we disagree with the Eighth Circuit's contention that EPA's power to object to "the issuance of such permit as being outside the guidelines and requirements of this Act," § 402 (d) (2), can only refer to § 304 (b) guidelines. *CPC I, supra,* at 1038–1039. Section 304 (h) provides for guidelines governing the procedure for issuance of permits; EPA can veto a permit if "the issuance of such permit" violated these guidelines.)

We are also unconvinced by the argument that our view of the Act violates the congressional intent to leave the States a major role in controlling water pollution. See *American Meat Institute, supra,* at 452.

by the States and other parties affected by the Act, we have no doubt whatever that its construction was sufficiently reasonable to preclude the Court of Appeals from substituting its judgment for that of the Agency." *Train* v. *Natural Resources Def. Council*, 421 U. S. 60, 87.[25]

When, as in this litigation, the Agency's interpretation is also supported by thorough, scholarly opinions written by some of our finest judges, and has received the overwhelming support of the Courts of Appeals, we would be reluctant indeed to upset the Agency's judgment. Here, on the contrary, our independent examination confirms the correctness of the Agency's construction of the statute.[26]

---

[25] Petitioners contend that the administrative construction should not receive deference because it was not contemporaneous with the passage of the Act. They base this argument primarily on the fact that EPA's initial notices of its proposed rulemaking refer to § 304 (b), rather than § 301, as the source of authority. But this is merely evidence that the Administrator originally intended to issue guidelines prior to issuing effluent limitation regulations. *American Frozen Food Institute* v. *Train, supra,* at 128 n. 6, 539 F. 2d, at 130 n. 6. In fact, in a letter urging the President to sign the Act, the Administrator stated that "[t]he Conference bill fully incorporates as its central regulatory point the Administration's proposal concerning *effluent limitations in terms of industrial categories and groups* ultimately applicable to individual dischargers through a permit system." 118 Cong. Rec. 36777 (1972), Leg. Hist. 149 (emphasis added). Finally, the EPA interpretation would be entitled to some deference even if it was not contemporaneous, "having in mind the complexity and technical nature of the statutes and the subjects they regulate, the obscurity of the statutory language, and EPA's unique experience and expertise in dealing with the problems created by these conditions." *American Meat Institute* v. *EPA, supra,* at 450 n. 16.

[26] This litigation exemplifies the wisdom of allowing difficult issues to mature through full consideration by the courts of appeals. By eliminating the many subsidiary, but still troubling, arguments raised by industry, these courts have vastly simplified our task, as well as having underscored the reasonableness of the agency view.

Consequently, we hold that EPA has the authority to issue regulations setting forth uniform effluent limitations for categories of plants.

## II

Our holding that § 301 does authorize the Administrator to promulgate effluent limitations for classes and categories of existing point sources necessarily resolves the jurisdictional issue as well. For, as we have already pointed out, § 509 (b) (1) provides that "[r]eview of the Administrator's action . . . in approving or promulgating any effluent limitation or other limitation under section 301, 302, or 306, . . . may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business . . . ."

Petitioners have argued that the reference to § 301 was intended only to provide for review of the grant or denial of an individual variance pursuant to § 301 (c). We find this argument unpersuasive for two reasons in addition to those discussed in Part I of this opinion. First, in other portions of § 509, Congress referred to specific subsections of the Act and presumably would have specifically mentioned § 301 (c) if only action pursuant to that subsection were intended to be reviewable in the court of appeals. More importantly, petitioners' construction would produce the truly perverse situation in which the court of appeals would review numerous individual actions issuing or denying permits pursuant to § 402 but would have no power of direct review of the basic regulations governing those individual actions. See *American Meat Institute* v. *EPA,* 526 F. 2d, at 452.

We regard § 509 (b)(1)(E) as unambiguously authorizing court of appeals review of EPA action promulgating an effluent limitation for existing point sources under § 301. Since those limitations are typically promulgated in the same proceeding as the new-source standards under § 306, we have no

doubt that Congress intended review of the two sets of regulations to be had in the same forum.[27]

### III

The remaining issue in this case concerns new plants. Under § 306, EPA is to promulgate "regulations establishing Federal standards of performance for new sources . . . ." § 306 (b)(1)(B). A "standard of performance" is a "standard for the control of the discharge of pollutants which reflects the greatest degree of effluent reduction which the Administrator determines to be achievable through application of the best available demonstrated control technology, . . . including, where practicable, a standard permitting no discharge of pollutants." § 306 (a)(1). In setting the standard, "[t]he Administrator may distinguish among classes, types, and sizes within categories of new sources . . . and shall consider the type of process employed (including whether batch or continuous)." § 306 (b)(2). As the House Report states, the standard must reflect the best technology for "that category of sources, and for class, types, and sizes within categories." H. R. Rep. No. 92–911, p. 111 (1972), Leg. Hist. 798.

The Court of Appeals held:

> "Neither the Act nor the regulations contain any variance provision for new sources. The rule of presumptive applicability applies to new sources as well

---

[27] It should be noted that petitioners' principal arguments are directed to the proposition that § 301 did not *mandate* the promulgation of industrywide regulations for existing point sources. But that ultimate proposition is not necessarily inconsistent with EPA's position that it was *authorized* to proceed by regulation if the aggregate effect of thousands of individual permit proceedings would not achieve the required effluent limitations by the 1977 and 1983 deadlines. Even with respect to the permit programs authorized by § 402, it is clear that EPA can delegate responsibilities to the States without surrendering its ultimate authority over such programs as well as over individual permit actions.

as existing sources. On remand EPA should come forward with some limited escape mechanism for new sources." *Du Pont II*, 541 F. 2d, at 1028.

The court's rationale was that "[p]rovisions for variances, modifications, and exceptions are appropriate to the regulatory process." *Ibid.*

The question, however, is not what a court thinks is generally appropriate to the regulatory process; it is what Congress intended for *these* regulations. It is clear that Congress intended these regulations to be absolute prohibitions. The use of the word "standards" implies as much. So does the description of the preferred standard as one "permitting *no* discharge of pollutants." (Emphasis added.) It is "unlawful for *any* owner or operator of *any* new source to operate such source in violation of any standard of performance applicable to such source." § 306 (e) (emphasis added). In striking contrast to § 301 (c), there is no statutory provision for variances, and a variance provision would be inappropriate in a standard that was intended to insure national uniformity and "maximum feasible control of new sources." S. Rep. No. 92–414, p. 58 (1971), Leg. Hist. 1476.[28]

---

[28] Petitioners attach some significance to the fact that compliance with a § 402 permit is "deemed compliance, for purposes of sections 309 [the federal enforcement section] and 505 [the citizen suit section], with sectio[n] . . . 306 . . . ." § 402 (k). This provision plainly cannot allow deviations from § 306 standards in issuing the permit. For, after standards of performance are promulgated, the permit can only be issued "upon condition that such discharge will meet . . . all applicable requirements under sectio[n] . . . 306 . . ." § 402 (a)(1); and one of the requirements of § 306 is that no new source may operate in violation of any standard of performance. § 306 (e). The purpose of § 402 (k) seems to be to insulate permit holders from changes in various regulations during the period of a permit and to relieve them of having to litigate in an enforcement action the question whether their permits are sufficiently strict. In short, § 402 (k) serves the purpose of giving permits finality.

That portion of the judgment of the Court of Appeals in 541 F. 2d 1018 requiring EPA to provide a variance procedure for new sources is reversed. In all other aspects, the judgments of the Court of Appeals are affirmed.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.