Justice Ginsburg,
with whom Justice Stevens and Justice Souter join, dissenting.
Petitioner Coeur Alaska, Inc., proposes to discharge 210,000 gallons per day of mining waste into Lower Slate *297 Lake, a 23-acre subalpine lake in Tongass National Forest. The “tailings slurry” would contain concentrations of aluminum, copper, lead, and mercury. Over the life of the mine, roughly 4.5 million tons of solid tailings would enter the lake, raising the bottom elevation by 50 feet. It is undisputed that the discharge would kill all of the lake’s fish and nearly all of its other aquatic life.[1]
Coeur Alaska’s proposal is prohibited by the Environmental Protection Agency (EPA) performance standard forbidding any discharge of process wastewater from new “froth-flotation” mills into waters of the United States. See 40 CFR § 440.104(b)(1) (2008). Section 306 of the Clean Water Act directs EPA to promulgate such performance standards, 33 U. S. C. § 1316(a), and declares it unlawful for any dis-charger to violate them, § 1316(e). Ordinarily, that would be the end of the inquiry.
Coeur Alaska contends, however, that its discharge is not subject to EPA’s regulatory regime, but is governed, instead, by the mutually exclusive permitting authority of the Army Corps of Engineers (Corps). The Corps has authority, under § 404 of the Act, 3 U. S. C. § 1344(a), to issue permits for discharges of “dredged or fill material.” By regulation, a discharge that has the effect of raising a water body’s bottom elevation qualifies as “fill material.” See 33 CFR § 323.2(e) (2008). Discharges properly within the Corps’ permitting authority, it is undisputed, are not subject to EPA performance standards. See ante, at 284; Brief for Petitioner Coeur Alaska 26; Brief for Respondent Southeast Alaska Conservation Council et al. 37.
The litigation before the Court thus presents a single question: Is a pollutant discharge prohibited under § 306 of the Act eligible for a § 404 permit as a discharge of fill ma *298 terial? In agreement with the Court of Appeals, I would answer no. The statute’s text, structure, and purpose all mandate adherence to EPA pollution-control requirements. A discharge covered by a performance standard must be authorized, if at all, by EPA.
I
A
Congress enacted the Clean Water Act in 1972 “to restore and maintain the chemical, physical, and biological integrity” of the waters of the United States. 33 U. S. C. § 1251(a). “The use of any river, lake, stream or ocean as a waste treatment system,” the Act’s drafters stated, “is unacceptable.” S. Rep. No. 92-414, p. 7 (1971). Congress announced in the Act itself an ambitious objective: to eliminate, by 1985, the discharge of all pollutants into the Nation’s navigable waters. 33 U. S. C. § 1251(a).
In service of its goals, Congress issued a core command: “[T]he discharge of any pollutant by any person shall be unlawful,” except in compliance with the Act’s terms. § 1311(a). The Act’s substantive requirements — housed primarily in Subchapter III, “Standards and Enforcement”— establish “a comprehensive regulatory program supervised by an expert administrative agency,” EPA. Milwaukee v. Illinois, 451 U.S. 304, 317 (1981). See also 33 U. S. C. § 1251(d) (“Except as otherwise expressly provided . . . , the Administrator of [EPA] shall administer this [Act].”).
The Act instructs EPA to establish various technology-based, increasingly stringent effluent limitations for categories of point sources. E. g., §§1311, 1314. These limitations, formulated as restrictions “on quantities, rates, and concentrations of chemical, physical, biological, and other constituents,” §1362(11), were imposed to achieve national uniformity among categories of sources. See, e. g., E. I. du Pont de Nemours & Co. v. Train, 430 U. S. 112, 129-130 *299 (1977). The limitations for a given discharge depend on the type of pollutant and source at issue.[2]
Of key importance, new sources must meet stringent “standards of performance” adopted by EPA under § 306(e). That section makes it “unlawful for any . . . new source to operate ... in violation of” an applicable performance standard. 33 U. S. C. § 1316(e) (emphasis added). In line with Congress’ aim “to insure . . . ‘maximum feasible control of new sources,’ ” du Pont, 430 U. S., at 138, the preferred standard for a new source is one “ ‘permitting no discharge of pollutants,’ ” id., at 137-138 (quoting 33 U. S. C. § 1316(a)(1); emphasis added). Moreover, new sources, unlike existing sources, are not eligible for EPA-granted variances from applicable limitations. 430 U. S., at 138.[3]
In 1982, EPA promulgated new source performance standards for facilities engaged in mining, including those using a froth-flotation milling process. See Ore Mining and Dressing Point Source Category Effluent Limitations Guidelines and New Source Performance Standards, 47 Fed. Reg. 54598. Existing mills, EPA found, were already achieving zero discharge; it was therefore practicable, EPA concluded, for new mills to do as well. Id., at 54602. Accordingly, under 40 CFR § 440.104(b)(1), new mines using the froth-flotation method, as Coeur Alaska proposes to do, may not discharge wastewater directly into waters of the United States.
*300 B
The nationwide pollution-control requirements just described are implemented through the National Pollution Discharge Elimination System (NPDES), a permitting scheme set forth in § 402 and administered by EPA and the States. The NPDES is the linchpin of the Act, for it transforms generally applicable effluent limitations into the individual obligations of each discharger. EPA v. California ex rel. State Water Resources Control Bd., 426 U. S. 200, 205 (1976). The discharge of a pollutant is generally prohibited unless the source has obtained an NPDES permit. E. g., EPA v. National Crushed Stone Assn., 449 U. S. 64, 71 (1980) (“Section 402 authorizes the establishment of the [NPDES], under which every discharger of pollutants is required to obtain a permit.”).
The Act also establishes a separate permitting scheme, administered by the Corps, for discharges of “dredged or fill material.” 33 U. S. C. § 1344(a). Section 404 hews to the Corps’ established expertise in matters of navigability and construction. The §404 program does not implement the uniform, technology-based pollution-control standards set out, inter alia, in § 306. Instead, § 404 permits are subject to regulatory guidelines based generally on the impact of a discharge on the receiving environment. See § 1344(b); ante, at 269.
As the above-described statutory background indicates, Coeur Alaska’s claim to a § 404 permit carries weighty implications. If eligible for that permit, Coeur Alaska can evade the exacting performance standard prescribed by EPA for froth-flotation mills. It may, instead, use Lower Slate Lake “as the settling pond and disposal site for the tailings.” App. 360a (Corps’ Record of Decision).
II
Is a pollutant discharge prohibited under § 306(e) eligible to receive a § 404 permit as a discharge of fill material? All *301 agree on preliminary matters. Only one agency, the Corps or EPA, can issue a permit for the discharge. See ante, at 274, 286. Only EPA, through the NPDES program, issues permits that implement § 306. See supra, at 297-298. Further, § 306(e) and EPA’s froth-flotation performance standard, unless inapplicable here, bar Coeur Alaska’s proposed discharge. See ante, at 278-279.
No part of the statutory scheme, in my view, calls into question the governance of EPA’s performance standard. The text of § 306(e) states a clear proscription: “[I]t shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source.” 33 U. S. C. § 1316(e). Under the standard of performance relevant here, “there shall be no discharge of process wastewater to navigable waters from mills that use the froth-flotation process” for mining gold. 40 CFR § 440.104(b)(1). The Act imposes these requirements without qualification.
Section 404, stating that the Corps “may issue permits” for the discharge of “dredged or fill material,” does not create an exception to § 306(e)’s plain command. 33 U. S. C. § 1344(a). Cf. ante, at 276. Section 404 neither mentions §306 nor states a contrary requirement. The Act can be home to both provisions, with no words added or omitted, so long as the category of “dredged or fill material” eligible for a § 404 permit is read in harmony with § 306. Doing so yields a simple rule: Discharges governed by EPA performance standards are subject to EPA’s administration and receive permits under the NPDES, not § 404.
This reading accords with the Act’s structure and objectives. It retains, through the NPDES, uniform application of the Act’s core pollution-control requirements, and it respects Congress’ special concern for new sources. Leaving pollution-related decisions to EPA, moreover, is consistent with Congress’ delegation to that Agency of primary responsibility to administer the Act. Most fundamental, adhering *302 to § 306(e)’s instruction honors the overriding statutory goal of eliminating water pollution, and Congress’ particular rejection of the use of navigable waters as waste disposal sites. See supra, at 298-301. See also 33 U. S. C. § 1324 (creating “clean lakes” program requiring States to identify and restore polluted lakes).[4]
The Court’s reading, in contrast, strains credulity. A discharge of a pollutant, otherwise prohibited by firm statutory command, becomes lawful if it contains sufficient solid matter to raise the bottom of a water body, transformed into a waste disposal facility. Whole categories of regulated industries can thereby gain immunity from a variety of pollution-control standards. The loophole would swallow not only standards governing mining activities, see 40 CFR pt. 440 (effluent limitations and new source performance standards for ore mining and dressing); id., pt. 434 (coal mining); id., *303 pt. 436 (mineral mining), but also standards for dozens of other categories of regulated point sources, see, e. g., id., pt. 411 (cement manufacturing); id., pt. 425 (leather tanning and finishing); id., pt. 432 (meat and poultry products processing). See also Brief for American Rivers et al. as Amici Curiae 26-27 (observing that discharges in these categories “typically contain high volumes of solids”). Providing an escape hatch for polluters whose discharges contain solid matter, it bears noting, is particularly perverse; the Act specifically focuses on solids as harmful pollutants. See 33 U. S. C. § 1314(a)(4) (requiring EPA to publish information regarding “conventional pollutants,” including “suspended solids”); Brief for American Rivers, supra, at 28-29, and n. 18 (identifying over 50 effluent limitations that restrict total suspended solids).[5]
Congress, we have recognized, does not “alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.” Whitman v. American Trucking Assns., Inc., 531 U. S. 457, 467-468 (2001). Yet an alteration of that kind is just what today’s decision imagines. Congress, as the Court reads the Act, silently upended, in an ancillary permitting provision, its painstaking pollution-control scheme. See ante, at 281. Congress did so, the Court holds, notwithstanding the lawmakers’ stated effort “to restore and maintain the chemical, physical, and biological integrity” of *304 the waters of the United States, 33 U. S. C. § 1251(a); their assignment to EPA of the Herculean task of setting strict effluent limitations for many categories of industrial sources; and their insistence that new sources meet even more ambitious standards, not subject to exception or variance. Would a rational legislature order exacting pollution limits, yet call all bets off if the pollutant, discharged into a lake, will raise the water body’s elevation? To say the least, I am persuaded, that is not how Congress intended the Clean Water Act to operate.
In sum, it is neither necessary nor proper to read the statute as allowing mines to bypass EPA’s zero-discharge standard by classifying slurry as “fill material.” The use of waters of the United States as “settling ponds” for harmful mining waste, the Court of Appeals correctly held, is antithetical to the text, structure, and purpose of the Clean Water Act.
* * *
For the reasons stated, I would affirm the judgment of the Ninth Circuit.

 Whether aquatic life will eventually be able to inhabit the lake again is uncertain. Compare ante, at 269, with App. 201a-202a and Southeast Alaska Conservation Council v. United States Army Corps of Engineers, 486 F. 3d 638, 642 (CA9 2007).

 In addition, the Act requires States to institute comprehensive water quality standards for intrastate waters, subject to EPA approval. See § 1313. This program supplements the technology-based standards, serving to “prevent water quality from falling below acceptable levels” even when point sources comply with effluent limitations. EPA v. California ex rel. State Water Resources Control Bd., 426 U. S. 200, 205, n. 12 (1976).

 Even the provision allowing the President to exempt federal installations from compliance with the Act’s requirements — “if he determines it to be in the paramount interest of the United States to do so” — does not extend to new source standards: “[N]o exemption may be granted from the requirements of section [306] or [307] of this [Act].” 33 U. S. C. § 1323(a).

 The Court asserts that “numerous difficulties” will ensue if a discharge governed by a new source performance standard is ineligible for a §404 permit. Ante, at 276. Namely, the Court notes, the discharger will have to determine whether a performance standard applies to it. Ante, at 277. That is not only the usual inquiry under the Clean Water Act; it is one Coeur Alaska answered, without apparent difficulty, when it sought and obtained an EPA permit for the proposed discharge from the lake into a downstream creek. See ante, at 270.
Justice Breyer fears that “litera[l] application]” of performance standards would interfere with efforts “to build a levee or to replace dirt removed from a lake bottom,” and thus “may prove unnecessarily strict.” Ante, at 292 (concurring opinion). His concerns are imaginative, but it is questionable whether they are real. Apple juice processors, meateutters, cement manufacturers, and pharmaceutical producers do not ordinarily build levees — and it is almost inconceivable that they would do so using the waste generated by .their highly specific industrial processes. See, e. g., 40 CFR §411.10 (performance standard for particular cement manufacturing process). Levee construction generally is undertaken by developers or government, entities not subject to performance standards for such a project. This litigation, furthermore, does not illustrate the “difficulty” Justice Breyer perceives. See ante, at 292. Coeur Alaska does not seek to build a levee or return dirt to a lake; it simply wants to use Lower Slate Lake as a waste disposal site.

 The “safeguards” Justice Breyer identifies are hardly reassuring. See ante, at 293 (concurring opinion). Given today’s decision, it is optimistic to expect that EPA or the courts will act vigorously to prevent evasion of performance standards. Nor is EPA’s veto power under § 404(e) of the Clean Water Act an adequate substitute for adherence to §306. That power — exercised only a dozen times over 36 years encompassing more than 1 million permit applications, see Brief for American Rivers 14— hinges on a finding of “unacceptable adverse effect,” 33 U. S. C. § 1344(e). Destruction of nearly all aquatic life in a pristine lake apparently does not' qualify as “unacceptable.” Reliance on ad hoe vetoes, moreover, undermines Congress’ aim to install uniform water-pollution regulation.