MERRITT, Circuit Judge,
dissenting.
The majority allows the silence of local Kentucky environmental regulators to turn the Clean Water Act on its head. They do this, despite the undisputed fact that illegal toxic discharges of dirty selenium water occurred, because they believe we must assume that Kentucky’s “general permit” tacitly authorizes toxic discharges of selenium. In so doing, they extend to the one-size-fits-all “general” permit a presumption previously applicable only to custom-tailored, “individual permits.” Because I find neither the authority nor the intention to allow these flagrant and unlimited violations of the Clean Water Act in the general permit at issue here, I dissent.
Congress enacted through the Clean Water Act a “national policy that the discharge of toxic pollutants in toxic amounts be prohibited.” 33 U.S.C. § 1251(a)(3). Congress ordered the EPA to include selenium — an element toxic to human and aquatic life — in the early lists of prohibited toxic pollutants. See Publication of Toxic Pollutant List, 43 Fed.Reg. 4108, 4108-09 (Jan. 31, 1978) (codified and updated at 40 C.F.R. § 401.15). In compliance with the Act, the EPA promulgated and Kentucky adopted water quality standards that established upper limits on selenium concentrations for long-term discharges (5 g/L for discharges exceeding 96 hours) and short-term discharges (20 g/L for discharges exceeding one hour). That is the law, and my colleagues are turning a blind eye to its enforcement. With this opinion in hand, coal mines in Kentucky are at liberty to violate the- Clean Water Act.
Congress allows neither Kentucky nor the EPA to issue permits approving discharges in excess of those regulations. 40 C.F.R. § 122.4. To the extent that the Act authorizes Kentucky’s regulators to issue permits, those permits’ “[ljimitations must control all pollutants” that in the agency’s assessment “will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard.” 40 C.F.R. § 122.44(d)(1). Everyone agrees that the toxic discharges of selenium from this mine exceed those limits. See, e.g., ICG Hazard Permit Appl. 6 (showing selenium concentrations of 29.2 g/L at one of the mine’s discharge points). But the mine and my colleagues believe the mine’s compliance with a general permit silent about selenium should exempt it from liability for its knowing violation of Congress’s national policy against polluting the waters.
The “permit shield” invoked here functions primarily to protect permit holders’ reliance on valid permits by “shielding” them from liability if regulators promulgate more rigorous standards during the term of a valid permit. E.I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 138 n. 28, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). In the context of an individual permit — a category of contractual permits issued after significant exchanges between a polluter and the issuing agency — the Fourth Circuit has interpreted this shield to protect polluters from liability for discharges tacitly approved by regulators. See Piney Run Pres. Ass’n v. Cnty. Comm’rs, 268 F.3d 255, 267-68 (4th Cir.2001). Under *293 the Piney Run approach, when an individual permit applicant discloses its expected discharges to a permitting authority, compliance with the terms of the individual permit may protect that polluter from liability for those disclosed emissions even if the permit does not specifically authorize those emissions. The polluter is thus permitted to rely on the regulators’ acquiescence to unproblematic emissions, just as contracting parties may sometimes rely on assurances provided during contract negotiations when interpreting a resulting ambiguous agreement.
The majority opinion suggests that if we decline to extend this interpretation to cover general permits “the permitting authority would not only need to identify the many pollutants that a single polluter could discharge, but all of the pollutants and combinations of pollutants that could be discharged by all polluters that may later fall under the general permit.” Maj. Op. at 287. It relies in part on a thirty-five-year-old EPA observation that “it is impossible to identify and rationally limit every chemical or compound present in a discharge of pollutants.” Id. at 287 (quoting Ketchikan Pulp Co., 7 E.A.D. 605, 618, 1998 WL 284964 (EAB 1998)); see Ketchikan Pulp Co., 7 E.A.D. at 618 n. 29 (citing 45 Fed.Reg. 33,516, 33,523 (May 19, 1980) (grounding that impossibility in “regulatory gaps” that close when EPA establishes regulations for a particular pollutant)).
This concern was valid when it was expressed at the beginning of the permitting process in the 1970s. See Ketchikan, 7 E.A.D at 618 & n. 29 (quoting Atl. States Legal Found., Inc., v. Eastman Kodak Co., 12 F.3d 353, 358 (2d Cir.1993) (quoting an EPA memorandum from Apr. 28, 1976)). It is also likely valid when applied to chemicals not covered by clear EPA regulations or state equivalents. See Atl. States Legal Found., 12 F.3d at 357-58 (rejecting a hyperbolic interpretation that would require explicit limits on all chemicals, including water). But neither a long-overcome dearth of validated standards nor an administrative prerogative to disregard the insignificant components of a polluter’s discharge justifies extending the permit shield to cover the knowing and otherwise-illegal discharge of one of the most clearly regulated toxic pollutants under the Clean Water Act.
The Clean Water Act prohibits the discharge of selenium without a permit. The EPA and Kentucky codified clear legal limits for those permits. Deference to a prior administrative choice to focus on the most dangerous chemicals and work with good faith applicants to advance the goals of the Clean Water Act does not require us to turn a blind eye to the knowing discharge of a notorious toxic pollutant. Kentucky’s agency lacked the authority to explicitly authorize a discharge of selenium in violation of the Clean Water Act. I see no reason to infer an ultra vires authorization for that illegal discharge from the state agency’s silence in its general permit. I would allow the plaintiff to proceed under the citizen suit provision of the Clean Water Act.