**ALTON BOX BOARD COMPANY,**
Petitioner-Appellant,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
Respondent-Appellee.

No. 78–1011.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1978.

Decided Feb. 14, 1979.

Richard J. Kissel and Jeffrey C. Fort, Chicago, Ill., for petitioner-appellant.

Erica L. Dolgin, LNR Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before CASTLE, Senior Circuit Judge, CUMMINGS and PELL, Circuit Judges.

CUMMINGS, Circuit Judge.

This case is before us on the petition of the Alton Box Board Company (Alton) seeking review of an October 21, 1977, order of the United States Environmental Protection Agency (EPA) denying Alton's request for a renewal of its National Pollutant Discharge Elimination System (NPDES) permit for the discharge of wastewaters from its mill located in a congested area of Alton, Illinois, into the Mississippi River. Alton also seeks review of EPA's December 21, 1977, denial of its request for an adjudicatory hearing concerning that action.

The petition for review is brought pursuant to Section 509(b)(1)(F) of the Clean Water Act (33 U.S.C. § 1369(b)(1)(F)), formerly known as the Federal Water Pollution Control Act.[1] This controversy concerns Alton's oldest mill which has been in operation since 1910. In 1972 half of the fiber requirements for this mill's paperboard manufacture came from wood chips pulped at the mill. Another major source of fiber was wastepaper. At that time, it became apparent that the pulping of wood chips as a primary source of fibers had to be abandoned to meet federal and Illinois water pollution standards established under the Federal Water Pollution Control Act, as amended in 1972 (33 U.S.C. § 1251 et seq.) and under Illinois laws.[2] The federal statute established a timetable for phased reduction in permitted pollutant discharges. Effluent levels which could be obtained by

---

1. In 1977 the name of the statute was changed to the Clean Water Act. 91 Stat. 1566.

2. The Illinois water pollution law was enacted in 1970 and amended in 1973. Ill.Rev.Stat.

(1977) ch. 111½ §§ 1011–1013. By regulations thereunder, Illinois has established more stringent effluent limitations than those established by EPA (Alton Br. 21).

the application of "best practicable control technology currently available" (BPT) were required by July 1, 1977. 33 U.S.C. § 1311(b)(1)(A). Also by July 1, 1977, the statute required compliance with any more stringent state standards. 33 U.S.C. § 1311(b)(1)(C). By July 1, 1983 (now July 1, 1984) these levels were to be reduced further to levels attainable by the application of the "best available [control] technology economically achievable" (BAT). 33 U.S.C. § 1311(b)(2). The BPT effluent limitations were to be based upon effluent "guidelines" promulgated by EPA after consideration of

"the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, * * * the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, nonwater quality environmental impact, (including energy requirements), and such other factors as the [EPA] Administrator deems appropriate."

33 U.S.C. § 1314(b)(1)(B).

In 1974 EPA published BPT guidelines and general BPT effluent limitations. 39 Fed. Reg. 18742. Ultimately the Supreme Court held that the Act as amended in 1972 "authorizes the 1977 limitations as well as the 1983 limitations to be set by regulation, so long as some allowance is made for variations in individual plants, as EPA has done by including a variance clause in its 1977 limitations." [3] *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 128, 97 S.Ct. 965, 975, 51 L.Ed.2d 204 (footnote omitted).

To meet Illinois and federal water pollution standards, Alton adopted the following four-stage program in 1973 to control biochemical oxygen demand ($BOD_5$) and suspended solids:

1) the installation of replacement processing equipment
2) the phasing out of wood chips and the phasing in of new sources of used corrugated fiber
3) closing up the mill process water system
4) treatability study and final treatment of residual flow.

Stages 1 and 2 of this program were necessary to accomplish the process change to accommodate the exclusive use of wastepaper as the source of fiber. Stages 3 and 4 were intended to bring Alton into compliance with BPT for plants exclusively using wastepaper. The four-stage completion program was submitted to the Illinois Pollution Control Board which permitted a variance from the general Illinois effluent limitations on a year to year basis from 1973 to April 1977 during construction which was to be completed on June 30, 1978. We are told that a requested extension to cover the final year of Alton's construction program and seeking a variance until April 6, 1978 [R. 915] is presently pending before the Illinois Pollution Control Board. The current status of that proceeding is not shown in the record but Alton must now be seeking a variance beyond April 1978.

When EPA promulgated its regulation for the pulp, paper and paperboard industry on May 29, 1974, the Alton mill was still using a combination of wood chips and reclaimed wastepaper to produce paperboard. By June 30, 1975, phase two of the previously described program was complete and the mill was converted into a mill manufacturing paperboard exclusively from reclaimed wastepaper, thus permitting Alton to begin collecting the necessary raw wasteload data for designing and constructing the end-of-pipe treatment facilities required to meet BPT for plants producing paperboard from wastepaper.

On November 13, 1974, EPA issued an NPDES permit to Alton for the mill, requiring completion of all necessary treatment facilities by March 1, 1977. The permit also required final compliance with Illinois law requirements by April 1, 1977. This compliance schedule was based upon a

---

**3.** The variance clause applicable to the pulp, paper and paperboard industry appears in 40 C.F.R. § 430.52.

study done on behalf of the Illinois Environmental Protection Agency (Illinois EPA) by Roy F. Weston, Inc. However, Alton disagreed with the conclusions of that study and on November 25, 1974, requested an adjudicatory hearing by EPA on the compliance schedule contained in the permit so that it would reflect the actual circumstances at the Alton mill.[4] On January 8, 1975, EPA granted the request for an adjudicatory hearing. Before the adjudicatory hearing took place, Alton and EPA entered into a stipulation resulting in the issuance of a modified NPDES permit on April 1, 1976, after the Illinois EPA had certified it a few days earlier. This permit included the construction schedule proposed by Alton and approved by the Illinois EPA and provided *inter alia* that Alton should start construction of wastewater treatment facilities by January 31, 1977 (R. 572).

The April 1976 modified permit's expiration date was June 30, 1977. No date for the completion of the project was included in the permit, but the schedule it contained for beginning work was the same as that accepted by the Illinois EPA, which showed an anticipated completion date of June 30, 1978.[5] On December 21, 1976, Alton applied to EPA for a renewal of the modified permit, as it was required to do 180 days before the permit expired. In a February 9, 1977, letter, Alton notified EPA that Alton had not yet been able to start construction of the wastewater treatment facilities specified in the existing permit because the Illinois EPA had not yet issued the required construction permit (under Ill. Rev.Stat. (1977) ch. 111½, Section 1012(b)). The construction was to have commenced on January 31, 1977.

On April 27, 1977, the Illinois EPA denied certification of a renewal permit for the Alton mill. Under 33 U.S.C. § 1341, such a certification is a predicate to an NPDES permit because the certification requirements cannot be waived by EPA where, as here, certification was denied by the State agency. Therefore, on May 31, 1977, EPA notified Alton that it was proposing to deny it a renewal permit. After various conferences between Alton and EPA representatives and a public hearing in Illinois, EPA denied Alton's request for a permit on October 21, 1977. EPA told Alton that the renewal of the permit was denied because Alton would not achieve the effluent limits necessary to satisfy either BPT or the more stringent Illinois standards by July 1, 1977, and because the Illinois EPA had refused to certify a renewal permit on April 27, 1977.

On November 2, 1977, Alton requested an adjudicatory hearing on the denial of the permit. In its request, Alton pointed out that this facility was fundamentally different from the facilities contemplated by EPA regulations and that a request for an extension of a previous variance from the requirements of Illinois law was still pending before the Illinois Pollution Control Board. Nevertheless a hearing was refused on December 21, 1977, on the principal ground that no issue of material fact had been raised.

EPA's own regulations provide for an adjudicatory hearing at the request of any interested person whenever an NPDES permit is granted, denied or modified.[6] 40 C.F.R. § 125.36. According to that regulation, the Regional Administrator is to grant the request for an adjudicatory hearing if it is timely and in the proper form and if it "[s]ets forth material issues of fact relevant

---

**4.** The Weston report had concluded that stages 3 and 4 of Alton's plan could be undertaken simultaneously. Alton, however, asserted that stage 3 had to be completed before stage 4 could be begun, thus making the schedule contained in the original permit impossible to meet.

**5.** At the oral argument, we were told that Alton's "waste water system" was structurally completed and might be in operation by December 31, 1978. Thus at best Alton was six

months behind the schedule agreed to by the Illinois EPA.

**6.** This Court held in *United States Steel Corporation v. Train*, 556 F.2d 822 (7th Cir. 1977) that EPA is subject to the Administrative Procedure Act (APA) when it grants or denies permits. An adjudicatory hearing is also required by the APA for grants or denials of permits.

to the question of whether a permit should be issued, denied or modified." 40 C.F.R. § 125.36(c)(ii).

In its letter refusing the adjudicatory hearing, EPA claimed that (1) Alton had waived any right to request effluent limitations based on the theory of fundamentally different factors, (2) Alton had made no showing of fundamentally different factors in its request for the hearing and (3) in any event EPA could not grant Alton a permit because it was not in compliance with the stricter state standards and had been denied certification by the state.[7]

We conclude that EPA must hold an adjudicatory hearing with respect to the renewal of Alton's NPDES permit. However, we will not direct EPA to issue a permit, for the primary jurisdiction doctrine requires that question to be decided initially by the agency after it conducts the adjudicatory hearing.[8]

7. We are informed that an enforcement proceeding is pending against Alton, charging it with polluting without a permit and operating in violation of state and federal standards. A fine could result from that proceeding, although apparently there has been no request for the mill to be shut down. In fact all parties agree that it appears likely that Alton will soon be in compliance with all federal and state requirements. However, because Section 509(b)(2) of the Clean Water Act (33 U.S.C. § 1369(b)(2)) prohibits a polluter from raising a defense in an enforcement action that was not exhausted in the permit process, Alton must pursue its request for an adjudicatory hearing to protect its rights.

8. Alton suggests that it has made its case entitling it to a variance, and that this Court should direct the Administrator to issue the permit it seeks. However, since EPA has not considered the merits of the variance argument, such action on our part would be premature.

Alton also argues that under the Clean Water Act EPA must grant pre-1972 polluters a permit which at least reflects the BPT limitations and any more stringent state standards. The terms of that permit could then be challenged via an adjudicatory hearing and judicial review if necessary. Violation of the terms of such a permit would give rise to the enforcement mechanism of Section 309 of the Act (33 U.S.C. § 1319).

EPA concedes that this procedure is open to it but contends that it has the option of denying the permit altogether. Then, it asserts, the

*Waiver*

EPA argues that Alton has waived any right it had to an adjudicatory hearing as to whether it was entitled to a variance from the BPT limitations based on fundamentally different factors because certain procedures assertedly established in the regulations were not followed and because the variance theory was not pursued in the ten months between the permit application and its denial. EPA points to the regulation establishing the variance procedure. 40 C.F.R. § 430.52. That regulation allows a discharger to submit evidence supporting its allegation of fundamentally different factors and provides for a written finding by the Regional Administrator as to whether such factors have been found to exist. EPA concluded in its December 21, 1977, hearing denial letter that "[t]his procedure is appropriate at the time a permit application is filed" (App.227). Since the procedure was not initiated at that time, Alton waived it, according to EPA.

limitations promulgated pursuant to Section 301(b)(1)(A) (33 U.S.C. § 1311(b)(1)(A)) have independent force. If a plant fails to comply with them, EPA can refer the case to the Justice Department, charging a violation of Section 301(a) (App.183–184).

Alton's position is difficult to square with the language of Section 402(a)(1), "the Administrator *may* * * * issue a permit * * *" (33 U.S.C. § 1342(a)(1), emphasis supplied). There is, however, at least oblique support for Alton's reading of the statute in the cases. *Environmental Protection Agency v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578; *United States Steel Corporation v. Train, supra*, at 830. In addition, EPA's contention that the BPT limitations define the parameters of allowable polluting even without a permit is difficult to reconcile with the Act's flat prohibition on polluting (33 U.S.C. § 1311(a)) and its reliance on the permit process to provide exceptions to that ban.

It does not appear that EPA or the courts have ruled definitively on the question. If Alton succeeds in obtaining the federal variance it seeks, presumably it will receive its permit and the question of whether EPA must issue a permit to a polluter which obviously cannot comply with its terms will become moot. It would therefore be inappropriate for us to confront the question now.

We cannot accept this conclusion. The fact that it may have been appropriate to seek the variance when the permit was requested does not necessarily mean it could not be done later. At least in the circumstances of this case, described below, the fact that the argument was not focused precisely on the question of fundamentally different factors until the 1977 request for an adjudicatory hearing does not foreclose the opportunity for such a hearing. Additionally, the mere lapse of time between the December 21, 1976, permit renewal application and its October 21, 1977, denial, during which Alton could have made the "fundamentally different factors" argument, does not foreclose it from making the argument at an adjudicatory hearing. A waiver must be intentional and voluntary. There is nothing in the record that suggests any such knowing relinquishment of legal rights, nor is there any suggestion that EPA was disadvantaged by Alton's failure to state its position earlier.

The facts underlying Alton's claim that fundamentally different factors apply to it have been before EPA since Alton's request for an adjudicatory hearing on the initial permit on November 25, 1974. At the time the BPT limitations for paperboard manufacturing were established in May 1974, Alton was using approximately 50% wood chips and 50% wastepaper in its process. It now argues that the fact that its process utilized both wood and paper when the 1972 amendments were enacted and when the 1974 implementing regulations were promulgated is a fundamentally different factor so that BPT as applied to it should differ from BPT for plants that used exclusively wastepaper at those times. Until November 2, 1977, when Alton requested the adjudicatory hearing presently at issue, its argument apparently was focused on the possibility of obtaining some sort of extension of the July 1, 1977, deadline for compliance with the limitations rather than on obtaining a variance from them. EPA, however, shares some responsibility for the development of the case in this way.

In its November 25, 1974, request for an adjudicatory hearing to modify the original permit, Alton asserted that it could not meet the April 1, 1977, deadline imposed in that permit because phases 3 and 4 of its plan (described *supra*) had to be implemented sequentially. EPA, on the other hand, insisted that they could be accomplished simultaneously. This feasibility dispute dominated all the subsequent proceedings and persists today. As previously described, in the modified permit issued April 1, 1976, EPA acquiesced in a construction schedule which would necessarily result in completion on June 30, 1978. Both parties agree that the modified permit was issued in the hope of a Congressional extension of the July 1, 1977, compliance deadline. EPA asserts that Alton was taking its chances on such an extension, whereas Alton says that while both parties hoped that Congress would act, if it did not do so, some sort of administrative extension was contemplated (App.177–181). The stipulation accompanying this modified permit specified that

"The acceptance of this permit and withdrawal of request for adjudicatory hearing of November 25, 1974, shall not constitute a waiver of any rights which the Permittee may have with regard to future, new or modified NPDES permits, adjudicatory hearings, or any hearing before any administrative or judicial body." (App.94.)

Subsequently, this Court and the Third Circuit held that EPA had no authority to extend the statutory deadline.[9] Congress did not authorize such extensions until it amended § 309 in December 1977 (33 U.S.C. § 1319(a)(5)(B)). In the interim, however, EPA had established a procedure for mitigating the potentially harsh effect of the July 1977 deadline by issuing Enforcement Compliance Schedule Letters (ECSL). These letters set compliance schedules which extended beyond July 1, 1977, and committed the EPA not to pursue an enforcement action so long as the recipient complied with the schedule set out in the letter. Since the permit still required com-

---

9. *United States Steel Corporation v. Train, supra; Bethlehem Steel Corporation v. Train,* 544 F.2d 657 (3d Cir. 1976), certiorari denied, 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 369 (1977).

pliance by July 1, 1977, an ECSL which recognized that the polluter could not comply by that date was not, according to EPA, an extension of the deadline but was merely an exercise of its prosecutorial discretion.

At the time Alton applied for its renewal permit on December 21, 1976, it apparently believed that it could secure an extension of the July 1, 1977, deadline [10] or at least an ECSL. After it received EPA's proposed determination to deny the permit on May 31, 1977, Alton continued to press for an ECSL (R. 1511–1519). EPA refused to grant an ECSL, apparently because it believed that Alton could have complied with the July 1, 1977, deadline by implementing phases 3 and 4 of its program simultaneously (App.177–181).

It appears that Alton's delay until November 1977 in making its argument that it was entitled to a federal variance from the BPT limitations was caused by its not unreasonable belief that some sort of extension of time was a possibility. In this situation we cannot say that Alton inexcusably failed to raise or intentionally waived this alternative variance argument.

### No Showing of Fundamentally Different Factors

■ In its letter denying Alton's request for an adjudicatory hearing, EPA also stated that Alton had failed to make a showing of fundamentally different factors on which an adjudicatory hearing could be based. Alton had alleged in its request for a hearing that the necessity of making a process change was a fundamentally different factor so that it was "entitled to a permit with effluent limitations based upon the capabilities of the mill" (App.211). This is a sufficiently clear allegation to justify a hearing.

At oral argument counsel for EPA expanded on the contention that Alton had failed to allege fundamentally different factors on which a variance could be based. According to her, the only such factors would be circumstances which make it impossible ever to comply with the limitations. Alton has not alleged that it is impossible

for it to comply, but only that it was impossible for it to comply by July 1, 1977. Since temporal impossibility is not a fundamentally different factor within the meaning of the regulations, Alton had raised no factual issue pertinent to the denial of a permit. This argument overlooks the fact that Alton is not now asserting merely that it could not comply in time, but that it was not required to meet the July 1, 1977, limitations set for plants utilizing exclusively wastepaper because it was not operating such a plant when the 1972 amendments were passed or when the limitations were established in 1974. The regulation establishing the variance procedure specifies "factors relating to the process applied" as within the factors to be considered (40 C.F.R. § 430.52). Therefore, Alton is entitled to a hearing on whether the fact that it employed a different process in 1974 entitles it to a variance from the July 1, 1977, BPT limitations for the type of plant it subsequently became.

### State Standards and Certification

■ EPA also asserted in its December 21, 1977, letter denying an adjudicatory hearing that it could not grant a permit since Alton was not in compliance with the stricter state standards and had been denied a certificate by Illinois. With exceptions inapplicable here, EPA is prohibited from issuing a permit when the state has not granted a certificate or waived certification. 33 U.S.C. § 1341.

Alton points out that the Illinois EPA refused to grant the certificate because, based on the position taken by EPA, it believed Alton was not in compliance with either the applicable federal or the state standards (App.120). The Illinois EPA opposed Alton's petition for a variance before the Illinois Pollution Control Board on the ground that the Board had no authority under Illinois law or the Clean Water Act to grant variances from the federal standards (App.924–928). Thus, according to Alton, Illinois could not or would not grant a variance from its standards and a certificate because EPA had said Alton was not in

---

**10.** The decision of this Court in *United States Steel Corporation v. Train, supra,* that the EPA had no authority to extend the deadline was not handed down until May 1977.

compliance with the federal limitations. Since EPA could not grant a permit without an Illinois certification, EPA concluded there was no issue of fact to adjudicate. As Alton points out, however, EPA could adjudicate whether Alton was entitled to a variance from the federal BPT limitations for wastepaper mills. A conclusion that it was so entitled would alter Alton's posture in seeking an Illinois variance and certificate.[11]

We therefore conclude that there was an issue of fact to be adjudicated, and that Alton is entitled to a hearing. The EPA's order denying Alton's request for an adjudicatory hearing is accordingly reversed.

---

11. Alton has represented that the Illinois EPA is now prepared to grant it a certificate or to waive certification. EPA responds that the Illinois EPA's current position is not a part of the record and that in any event if Illinois wants to certify Alton it can issue a permit itself. It bases this conclusion on the fact that the permitting process was transferred from EPA to Illinois, pursuant to 33 U.S.C. § 1342(b), on October 23, 1977. However, Alton's application for a renewal permit was not transferred to the Illinois EPA, apparently because it was already under consideration by EPA. Since the hearing sought by Alton is an attempt retroactively to change the conclusion reached by EPA, it is not at all clear that the Illinois EPA would have the authority to give Alton the relief it seeks. To complicate matters further, this Court has recently decided that because of the federal EPA Administrator's failure to promulgate certain guidelines required by the Clean Water Act, his approval of the Illinois permit process must be withdrawn. *Citizens for a Better Environment v. Environmental Protection Agency,* (No. 78–1042, decided January 26, 1979). Presumably this means that until corrective action is taken, permits must be granted by EPA. The coming Alton adjudicatory hearing will have to take account of this Court's decision.

Under all the circumstances, it appears that Alton is correct in asserting that EPA, rather than the Illinois EPA, must make the decision regarding a variance from federal BPT limitations.