899 F.2d 1383
 20 Envtl. L. Rep. 20,816
 WESTVACO CORPORATION, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Respondents.
 Nos. 89-2180, 89-2181.
 United States Court of Appeals,
Fourth Circuit.
 Feb. 13, 1990.
 ORDER
 
 1
 This matter is before the court on the motion of the United States Environmental Protection Agency (EPA) to dismiss consolidated petitions for review filed by Westvaco Corporation (Westvaco) challenging certain agency actions taken by EPA Region III on June 2, 1989. Specifically, on that date EPA proposed to partially disapprove lists of "impaired waters" submitted by the states of Maryland and Virginia, respectively, pursuant to Sec. 304(l ) of the Clean Water Act (CWA). 33 U.S.C. Sec. 1314(l ). EPA contends that this court lacks jurisdiction over these petitions. The parties have submitted extensive legal memoranda in support of and opposition to the motion to dismiss. We agree with the EPA's contentions and will dismiss the petitions for lack of jurisdiction in this court to review the challenged actions at this time.I
 
 
 2
 The general legal background and procedural history of this case is given as agreed to by the parties.
 
 
 3
 As a primary means of achieving its ultimate goals, the CWA prohibits the discharge from any point source into protected national waters of any pollutant unless that discharge complies with specific requirements of the CWA. Section 301(a), 33 U.S.C. Sec. 1311(a); Sec. 502(12); 33 U.S.C. Sec. 1362(12). Compliance may be achieved by obtaining a permit issued pursuant to Sec. 402. 33 U.S.C. Sec. 1342.
 
 
 4
 Section 402 establishes the National Pollutant Discharge Elimination System (NPDES) permit program. 33 U.S.C. Sec. 1342. See Environmental Protection Agency v. California, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1975). NPDES permits are issued by EPA or, in those states in which EPA has authorized a state agency to administer the NPDES program, by that agency subject to EPA review. 33 U.S.C. Sec. 1342(a)-(d). EPA has approved 39 states to issue NPDES permits, including Maryland and Virginia. See 33 U.S.C. Sec. 1342(b).
 
 
 5
 NPDES permits may be issued for terms up to five years. Section 402(b)(1)(B), 33 U.S.C. Sec. 1342(b)(1)(B). Permits must incorporate technology-based controls, i.e., limitations based on the degree of effluent control which can be achieved by point sources using various levels of pollution control technology. See Secs. 301, 304, 33 U.S.C. Secs. 1311, 1314. See also E.I. DuPont de Nemours & Co. v. Train, 430 U.S. 112, 126-36, 97 S.Ct. 965, 974, 51 L.Ed.2d 204 (1977). In addition to technology-based controls, permits must contain any more stringent limitations that are necessary to meet water quality standards developed by the states pursuant to Sec. 303. 33 U.S.C. Sec. 1313. If standards are not established by a state, EPA must establish the water quality standards for the waters in that state. Section 301(b)(1)(C), 33 U.S.C. Sec. 1311(b)(1)(C). Water quality standards consist of: (i) a designated "use" for the waters in question (e.g., public water supply), and (ii) "water quality criteria" specifying the amount of various pollutants which may be present in those waters and still achieve the designated use(s). 40 C.F.R. Secs. 131.2, 131.3 (1988). The state "water quality criteria" may be expressed as numerical concentration limits or in narrative form. 40 C.F.R. Sec. 131.3(b).
 
 
 6
 Unlike technology-based limitations, water quality standards are not developed based on an evaluation of the capability of pollution control technologies but on the physical attributes of the water segment necessary to support the designated uses. Once water quality standards have been set, NPDES permit limitations must be established to assure compliance, regardless of the availability or effectiveness of treatment technologies.
 
 
 7
 The CWA requires that approved states' NPDES permitting programs be consistent with minimum federal requirements. 33 U.S.C. Sec. 1314(i). Accordingly, EPA is given authority to review every state-issued NPDES permit. Section 402(b), 33 U.S.C. Sec. 1342(b). To facilitate EPA's task, the CWA requires the state permitting authority to provide EPA with a copy of each permit application and provide notice of developments during the permitting process. Section 402(d)(1), 33 U.S.C. Sec. 1342(d)(1); 40 C.F.R. Secs. 123.43(a)(1), 123.43(a)(2) (1988). Section 402(d)(2) prohibits issuance of a permit by a state if the Administrator of EPA objects within 90 days. 33 U.S.C. Sec. 1342(d)(2). If the state fails to submit a revised permit satisfying EPA's objections, EPA is authorized to issue a federal NPDES permit. Section 402(d)(4), 33 U.S.C. Sec. 1342(d)(4); 40 C.F.R. Sec. 123.44 (1988).
 
 
 8
 Where EPA assumes permit-issuing authority pursuant to Sec. 402(d) and 40 C.F.R. Sec. 123.44(h), EPA's regulations provide a comprehensive process for issuance of a final permit. See 40 C.F.R. Secs. 124.6-124.15. If EPA intends to issue the permit, the Agency publishes a public notice of, and solicits public comment on, the draft permit. 40 C.F.R. Sec. 124.10. After the close of the public comment period, EPA issues a final permit decision. 40 C.F.R. Sec. 124.15(a). Any interested person may request an evidentiary hearing on EPA's final permit decision, with review before the Administrator. 40 C.F.R. Secs. 124.74(a), 124.91. Final agency action on a permit does not occur until administrative remedies have been exhausted. 40 C.F.R. Sec. 124.60(g). The Administrator's action in issuing or denying a permit is reviewable in the Courts of Appeals. Section 509(b)(1)(F), 33 U.S.C. Sec. 1369(b)(1)(F).
 
 
 9
 In 1987, Congress passed the Water Quality Act (WQA) which placed greater emphasis on attaining state water quality standards. In particular, Sec. 308 of the WQA amendments made several changes to the provisions of the CWA to focus attention on attaining water quality standards for toxic pollutants.
 
 
 10
 The first component of the WQA Sec. 308 water quality program for toxic pollutants was the establishment of the Sec. 304(l ) program, entitled "Individual Control Strategies for Toxic Pollutants." 33 U.S.C. Sec. 1314(l ). Section 304(l)(1)(D) requires the states, within two years after February 4, 1987, to establish individual control strategies (ICS) which will reduce point source discharges of toxic pollutants sufficient to attain the water quality standards within three years. 33 U.S.C. Sec. 1314(l)(1)(D). Section 304(l) requires EPA to approve or disapprove the state submissions of ICSs by June 4, 1989. 33 U.S.C. Sec. 1314(l)(2). In the event of a state's failure to submit the lists and ICSs, or if EPA disapproves an ICS, EPA is required to develop the lists and the ICSs in cooperation with the state. Section 304(l), 33 U.S.C. Sec. 1314(l)(3). These deadlines have effectively required the states and EPA to place high priority on identifying and controlling certain "toxic hot spots."
 
 
 11
 In order to identify these "toxic hot spots," Sec. 304(l)(1)(B) requires the states to list those waters that are not expected to achieve applicable water quality standards, after application of technology based controls, due to discharges from point sources of toxic pollutants. 33 U.S.C. Sec. 1314(l)(1)(B). This list is commonly referred to as the "B list." For each water segment listed on the B list, Sec. 304(l)(1)(C) requires the states to identify the point sources responsible for the discharges of the toxic pollutants. 33 U.S.C. Sec. 1314(l)(1)(C). This list is commonly referred to as the "C list."
 
 
 12
 For each point source on the C list, Sec. 304(l)(1)(D) requires the states to develop the individual control strategy (ICS) discussed above.
 
 
 13
 Section 304(l) did not change the basic requirements of the CWA; rather it simply established a mandatory schedule for the completion of a toxic pollutant subset of the water quality-related activities that the CWA already imposed. Thus, before 1987, Sec. 303(g) already had required states--without any deadline--to evaluate their waters and identify those which needed controls beyond technology-based controls. 33 U.S.C. Sec. 1313(d). Section 301(b)(1)(C) already had required limitations in permits to meet water quality standards for all pollutants. 33 U.S.C. Sec. 1311(b)(1)(C).
 
 
 14
 EPA has now promulgated final regulations interpreting and implementing Sec. 304(l). See 54 Fed.Reg. 246-58 (Jan. 4, 1989) and 23,868-99 (June 2, 1989) (to be codified at 40 C.F.R. Secs. 130.10, 123.46). The regulations establish the procedure for review of a state's lists of ICSs. In the event of a preliminary disapproval of the lists or ICSs, the procedures is similar to agency rulemaking, in that public participation is sought. On the other hand, if EPA approves a state's lists and ICSs, the Sec. 304(l) listing process is complete and, therefore, constitutes final agency action. (Codified at 40 C.F.R. Sec. 130.10(d)(8)). The regulations specify that EPA will make preliminary disapprovals by June 6, 1989. (To be codified at 40 C.F.R. Sec. 130.10(d)(8)). The regulations require EPA to solicit and respond to public comment before any final disapproval decision on the lists or ICSs is made. (To be codified at 40 C.F.R. Sec. 130.10(d)(10)). The public comment period is 120 days from the date of the region's preliminary disapproval. (To be codified at 40 C.F.R. Sec. 130.10(d)(10)(vi)). Once the public comment period ends, EPA must make a final decision by June 1990, taking into account the public comments. (To be codified at 40 C.F.R. Sec. 130.10(d)(11)). The regulations contemplate that EPA's preliminary disapproval of a state's lists and associated ICSs may be modified (i.e., waters and point sources may be added or deleted) based on the additional data or information EPA receives during the public comment period. (To be codified at 40 C.F.R. Sec. 130.10(d)(11)(i)).
 
 
 15
 Exercising its agency discretion, EPA has defined an ICS to be a draft or final NPDES permit, with supporting documentation showing that effluent limits are sufficient to meet the applicable water quality standards. (To be codified at 40 C.F.R. Sec. 123.46(c)). Therefore, in order to fulfill the mandate of Sec. 304(l) that ICSs be developed by June 1990 for all listed point sources, some unexpired NPDES permits will have to be re-evaluated and possibly modified using existing NPDES permit issuance procedures.
 
 
 16
 Westvaco's petition for review in No. 89-2180 challenges EPA's preliminary disapproval of Maryland's Sec. 304(l) lists and associated ICSs developed by the Maryland Department of the Environment. Westvaco owns and operates a bleached kraft pulp and paper mill in Luke, Maryland.
 
 
 17
 On February 3, 1989, the Maryland Department of the Environment had submitted its Sec. 304(l) lists and ICSs to EPA Region III (the lists were subsequently modified by Maryland on May 10, 1989). Maryland did not include the North Branch of the Potomac River on its B list, or Westvaco's Luke Mill (which is located on that water segment) on its C list, and did not submit an ICS for this point source of dioxin. EPA Region III reviewed and proposed to disapprove Maryland's lists and ICSs on June 12, 1989. Among the reasons for the preliminary disapproval was Maryland's failure to list Westvaco's Luke Mill.
 
 
 18
 EPA Region III solicited public comment on its June 2 preliminary partial disapproval of Maryland's lists and ICSs by notice dated June 5, 1989. The notice was published in two daily newspapers of general circulation in Maryland. EPA Region III also directly solicited comment from Westvaco in a letter dated June 6, 1989. Westvaco and others submitted comments during the public comment period, which closed on October 5, 1989.
 
 
 19
 Pursuant to Sec. 304(l)(3) EPA is required to take final action on the Maryland lists and respond to the public comments by June 1990. In making its final decision, EPA must consider the additional data and information received during the public comment period. EPA has discretion to add or delete waters and point sources prior to making its final decision.
 
 
 20
 Westvaco's petition for review in No. 89-2181 challenges EPA's preliminary disapproval of Virginia's Sec. 304(l ) lists and associated ICSs developed by the Virginia Water Control Board. Westvaco owns and operates a bleached kraft pulp and paper mill in Covington, Virginia.
 
 
 21
 On February 3, 1989, the Virginia Water Control Board had submitted its Sec. 304(l) lists and ICSs to EPA Region III (the lists were subsequently modified by Virginia on February 16, 1989). Virginia did not place the Jackson River on its B list, or Westvaco's Covington Mill (which is located on that water segment) on its C list, and did not submit an ICS for this point source of dioxin. EPA Region III reviewed and proposed to disapprove Virginia's lists and ICSs on June 1, 1989. Among the reasons for the preliminary disapproval was Virginia's failure to list Westvaco's Covington Mill.
 
 
 22
 EPA Region III solicited public comment on its June 2 preliminary partial disapproval of Virginia's lists and ICSs by notice dated June 5, 1989. The notice was published in four daily newspapers of general circulation in Virginia. EPA Region III also directly solicited comment from Westvaco in a letter dated June 6, 1989. Westvaco and others submitted comments during the public comment period, which closed on October 5, 1989.
 
 
 23
 Pursuant to Sec. 304(l)(3) EPA is required to take final action on the Virginia lists and respond to the public comments by June 1990. In making its final decision, EPA must consider the additional data and information received during the public comment period. EPA has discretion to add or delete waters and point sources prior to making its final decision.
 
 II
 
 24
 Westvaco's petitions for review challenge EPA's preliminary partial disapprovals of the Maryland and Virginia lists which, it asserts, may affect its Luke and Covington Mills. Specifically, the petitions seek judicial review of EPA's proposed B and C lists for Maryland and Virginia, and of the associated ICSs that may be promulgated for the Luke Mill and Covington Mill sources.
 
 
 25
 Our jurisdiction to review agency action under the CWA is limited to the categories of agency action identified in 33 U.S.C. Sec. 1369(b)(1), and is further subject to the general limitation that only final agency action is subject to immediate judicial review. See Champion Int'l Corp. v. EPA, 850 F.2d 182, 187-90 (4th Cir.1988) (EPA objection to state permit not immediately reviewable; only permit issued over objection would be); American Paper Institute v. EPA, 882 F.2d 287, 289 (7th Cir.1989) (EPA Region's "policy statement" on dioxin tolerances not immediately reviewable; only permit denial or modification flowing from the statement would be).
 
 
 26
 Westvaco, candidly professing its uncertainty about the immediate reviewability of the EPA actions challenged here, hence its fear that failure to seek review now might preclude its right to have the actions reviewed in later enforcement proceedings, see 33 U.S.C. Sec. 1369(b)(2), has at one time or another suggested three possible bases for our jurisdiction to review the challenged actions at this point. In its petitions and docketing statements, Westvaco originally identified as a jurisdictional source Sec. 1369(b)(1)(G), which confers jurisdiction over "the Administrator's action ... in promulgating any individual control strategy under Sec. 1314(l )...." Later conceding that the actions challenged did not constitute "promulgation" of ICSs, Westvaco has abandoned its reliance on Sec. 1369(b)(1)(G), and relies upon Secs. 1369(b)(1)(D), and 1369(b)(1)(E). We take these in order.
 
 
 27
 * CWA Sec. 509(b)(1)(D), 33 U.S.C. Sec. 1369(b)(1)(D), confers jurisdiction to review agency action "in making any determination as to a state permit program submitted under section 1342(b) [of Title 33]." Westvaco's contention, though more elaborately developed, can be summarized as follows:
 
 
 28
 The challenged agency action of making preliminary disapproval of the affected states' B and C list submissions and adding waters and point sources to each constituted "determinations as to ... state permit program[s]" within contemplation of Sec. 509(b)(1)(D). In general, it is contended that this was an "implicit determination" that the states had failed to perform the basic obligation imposed by Sec. 302(a), 33 U.S.C. Sec. 1312(a) "to protect water quality." More specifically, Westvaco says that the agency action "determined": that the affected states' presently approved narrative water quality standards were no longer adequate; that the effluent limitations in the states' extant permits for the two point sources did not ensure attainment of the dioxin criterion; and that the extant permits must therefore be reopened to impose new effluent limitations in the form of ICSs.
 
 
 29
 EPA suggests that these contentions by Westvaco reflect a view that any decision taken by EPA that remotely relates to a state's administration of its NPDES programs is reviewable under Sec. 509(b)(1)(D). It may be more accurate to say that they reflect Westvaco's view that it cannot in prudence fail to make the argument. But we agree that to adopt the argument would be to open Sec. 509(b)(1)(D)'s jurisdictional doors just that wide. We do not believe this would be a proper interpretation of the statute; and we are sure that it would serve only to compound the practical problem posed by the facially uncertain review-preclusion (or waiver) rule of 33 U.S.C. Sec. 1369(b)(2). See American Paper Institute, Inc., 882 F.2d at 289 ("the more we pull within 509(b)(1), the more arguments will be knocked out by inadvertence later on--and the more reason firms will have to petition for review of everything in sight").
 
 
 30
 EPA's answering arguments against reading the Sec. 509(b)(1)(D) jurisdictional grant this broadly are equally elaborate and do not require full explication here. Suffice it to say that we agree that in none of the respects suggested by Westvaco do the challenged EPA actions here constitute the kind of "determination" contemplated by subsection (D). We summarize our reasons but briefly.
 
 
 31
 As to the suggestion that preliminary disapproval by EPA of WQA "B" and "C" toxic hot-spot lists constitute an "implicit determination" of general failure to perform the obligation to protect water quality imposed by Sec. 302(a), it is enough to note that Sec. 302(a) does not directly impose any such obligation on the states. It merely authorizes the EPA Administrator--not the states--to establish more stringent effluent limitations than those required by technology-based limitations. See NRDC v. EPA, 859 F.2d 156, 171 (D.C.Cir.1988).
 
 
 32
 The suggestion that there has been a "determination" that the affected states' water quality standards are inadequate, which is in turn a "determination as to a state program submitted under Sec. 402(b)" is equally unsound. All states have to develop and submit water quality standards for EPA approval; only states that apply for the opportunity are required to submit state NPDES programs. Review of water quality standards is committed, where appropriate at all, to the district courts; Sec. 509(b)(1) confers no jurisdiction to review EPA approvals and disapprovals of water quality standards. Cf. Bethlehem Steel Corp. v. EPA, 538 F.2d 513 (2d Cir.1976) (no jurisdiction in courts of appeals); United States Steel Corp. v. Train, 556 F.2d 822, 837 (7th Cir.1977) (jurisdiction over Administrators approval of water quality standards in district courts).
 
 
 33
 Finally, the suggestion that preliminary disapproval of "B" and "C" lists and proposals to add to them constitutes a "determination" as to a state program submitted under Sec. 402(b) is without merit. EPA may contest specific limitations in particular permits without drawing an entire state permit program into question. Under Sec. 402(d), states have to submit each permit for EPA approval, and if EPA objects, it may issue the permit where agreement with the state is not reached. In such cases, EPA's issuance of the permit is reviewable independently of any review of an EPA "determination as to a state permit program," which is what Sec. 509(b)(1)(D) is about. See Champion, 850 F.2d at 187-88. EPA is simply given comparable authority under Sec. 304(l) with respect to approval or disapproval of state ICSs, and the review paths are similar. EPA preliminary disapproval of a state ICS is not a "determination as to a state permit program under Sec. 402(b)"; it relates to a quite different and discrete "program."
 
 B
 
 34
 CWA Sec. 509(b)(1)(E), 33 U.S.C. Sec. 1369(b)(1)(E), confers jurisdiction to review agency actions in approving or promulgating any effluent limitations or other limitations under [the CWA]."
 
 
 35
 Westvaco contends that the challenged agency action amounted to the promulgation of enforceable remedial measures for its two mills, hence constituted action subject to review under this jurisdictional grant. Specifically, Westvaco points to EPA's letter notification of its "understanding" that the states would issue revised permits by the legal deadlines, and that it might submit a later notification that "EPA intends to issue the ICS."
 
 
 36
 These statements require nothing of Westvaco; they impose no obligations enforceable by EPA. As EPA's letter clearly states, the only consequence of the states' failure to do anything in response will be for the EPA to promulgate ICSs, an event that may or may not occur. The jurisdictional grant in Sec. 509(b)(1)(E) cannot be construed to cover such preliminary, contingent action by EPA.
 
 
 37
 Finally, alternatively, Westvaco suggests that EPA's proposed finding that Westvaco's mills are discharging into a body of water that is not attaining water quality standards is a "promulgation of an effluent limitation" within contemplation of Sec. 509(b)(1)(E). This is patently without merit.
 
 
 38
 As EPA points out, even if EPA had actually determined finally that Westvaco's permits needed more stringent limitations to meet WQA toxic pollution standards (which it has not) that decision would not be reviewable at this point. Such an action under Sec. 304(l) procedures would be comparable to an EPA objection to a permit issued by a state under Sec. 402(d). Such an objection is not immediately reviewable, but must await final action in the form of an EPA permit issuance. Champion, 850 F.2d at 182, 190. The same principle must apply to preliminary disapproval of states' "B" and "C" lists submitted under Sec. 304(l).
 
 III
 
 39
 For the reasons above given, we dismiss the petitions for review for lack of jurisdiction at this time to review the challenged actions.
 
 
 40
 Entered by direction of Circuit Judge PHILLIPS, with the concurrences of Circuit Judge DONALD RUSSELL and Circuit Judge K.K. HALL.